**In re JANSSEN CHAROLAIS RANCH, INC., Debtor.**

**Bankruptcy No. 86–40693.**

United States Bankruptcy Court, D. Montana.

May 5, 1987.

Charles W. Hingle, Billings, Mont., for debtor.

A. Lance Tonn, Miles City, Mont., for Powder River Bank.

Malcolm Goodrich, Billings, Mont., for Federal Land Bank.

## ORDER

JOHN L. PETERSON, Bankruptcy Judge.

At Butte in said District this 5th day of May, 1987.

In this Chapter 12 proceeding, hearing on the Debtor's Chapter 12 Plan was held on March 24, 1987. Objections to the Plan were filed by one of the secured creditors, Powder River Bank (Bank), on the grounds (1) the amount of the claim stated in the Plan is in error; (2) the Plan is not filed in good faith; (3) the Plan fails to comply with Section 1225(a)(5) of the Code; (4) the annual payments proposed under the Plan should be greater; and (5) ownership in some assets (livestock) is in dispute.

The Debtor is a family farm corporation, and operating a cow-calf and grain ranching business in Powder River County, Montana. The underlying mortgage in the real property is held by Federal Land Bank

Association (FLB), which debt is now in default. The Debtor's Plan will cure the default by payment of accrued interest and the contract will then be reinstated according to terms. The present term of the contract is 35 years and the interest rate is 10¾%. Powder River Bank is owed $289,-802.18 and is fully secured by a perfected security interest in the Debtor's cattle, machinery and land. The Debtor values the collateral at $541,677.00. The Plan proposes to pay the Bank over 30 years at 8% interest, which calls for payments of $23,-882.51 annually. The Bank's debt arises from two promissory notes, one for $245,-000.00 at 14.5% interest, due December 15, 1985, and one for $20,000.00 at 13.25% also due December 15, 1985. The notes were incurred as operating loans by the Debtor. The Bank contends the Plan's proposed payment over 30 years at 8% is unreasonable, and suggests a 10 year payment at 10¾%, which is the equivalent of the present FLB tier two interest rate. Under the Bank proposal, the annual payment would be $47,635.59.

The Debtor's cash flow analysis for the three year term of the Plan projects income of $115,653.00, $103,363.00 and $131,713.00 against estimated expenses of $79,400.00, $96,134.00 and $102,434.00. The Debtor thus shows net income after payments to creditors for the three year period of $36,-252.00, $43,481.00 and $72,759.00, respectively.

The Debtor's Plan proposes the following payments:

|  | 1987 | 1988 | 1989 |
|---|---|---|---|
| Property Taxes | $ 1,262.87 | $ 1,262.87 | $ 1,262.87 |
| FLB | 7,131.63 | 19,905.14 | 19,905.14 |
| Powder River Bank | 23,882.51 | 23,882.51 | 23,882.51 |
| Unsecured Creditors | 3,608.33 | 3,608.33 | 3,608.33 |
| Trustee Fees | 2,875.37 | 2,875.37 | 2,875.37 |

Unsecured creditors will be paid 100% of their claims, without interest.

The Bank presented testimony that the current market rate of interest was 11.5% to 12.5% on a ten year term for a similar type of loan of the Debtor. According to the Bank, the present value of the payment under the Plan is $194,784.00, computed at 8% over 30 years, which is less than the Bank would receive in the event of liquidation. The Debtor presented no testimo-

ny on market interest rates or terms of similar loans.

The Debtor relies on the language of the Chapter 12 Code provisions stating that case law, as represented by *In re White*, 36 B.R. 199 (Bankr.Kan.1983), allows restructuring of a long term debt. *White* was a Chapter 11 case which held that § 1129 does not per se prohibit long-term payments. Better analogy, however, is gained from Chapter 13 case law. Indeed, the joint explanatory statement of the Committee on H.R. 5316, Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986, stated in part in describing Chapter 12:

"The new chapter is closely modeled after existing chapter 13. * * *" H.R. 5316, 99th Cong. 2nd Sess., 132 Cong. Rec.H. 8999 (1986).

■ Chapter 13 case precedents thus provide a valuable tool for interpretation of Chapter 12 provisions because of the similar or identical language of each chapter. For example, Section 1222(a)(3) is identical to 1322(a)(3), as is 1222(b)(3) and (5) with 1322(b)(3) and (5). The language of 1322(b)(2) is nearly identical with 1222(b)(2) except for the provision on home mortgages. The provisions of Section 1222(a) are mandatory plan provisions, while 1222(b) are permissive. *In re Maloney*, 25 B.R. 334, 336 (1st Cir. BAP 1982) discussing the parallel provisions of 1322(a) holds:

"The provisions of § 1322(a) are mandatory, and a document which fails to include the required provisions is insufficient to constitute a Chapter 13 plan. N. at 336. See, e.g. *National City Bank v. Purdy (In re Purdy)*, 16 B.R. 847, 850 (N.D.Ga.1981). Accord, *Foster v. Heitkamp (In re Foster)*, 670 F.2d 478, 483–84 (5th Cir.1982)."

Plan provisions may include under 1222(b)(3) and (5) the right to "(3) provide for the curing or waiving of any default" and "(5) provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due

after the date on which the final payment under the plan is due." In this circuit a like provision of 1322(b)(5) has been interpreted to deal with long-term debt. *In re Fontaine*, 27 B.R. 614, 615 (9th Cir. BAP 1982) holds:

"The Legislative history of this section states:

'Paragraph 5 concerns long-term debt, such as mortgage debt.' H.R. 95–595, 95th Cong. 1st Sess. (1977), U.S.Code Cong. & Adm.News 1978, pp. 5787, 6384.

Therefore, only default on long-term debt is curable under 1322(b)(5). The definition of long term is found both in the legislative history and the section itself. Long-term debt is '[a]ny unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due'. 1322(b)(5) and H.R. 95–595, 95th Cong. 1st Sess. (1977), U.S. Code Cong. & Adm. News, 1978, P. 6384."

When a debt has been fully matured by its own terms before a Chapter 12 is filed, it is not long term debt within the meaning of 1222(b)(5). When the debt is a mortgage on real property for an extended period of time, it is a long term debt under 1322(b)(5) even if it has been reduced to judgment on foreclosure. *In re Seidel*, 752 F.2d 1382, 1386–87 (9th Cir.1985).

Under 1222(b)(2), the Plan may "modify the rights of holders of secured claims * * * ". This is consistent with 1123(a)(3), (a)(5)(E), and unlike Chapter 13, the provision does not prohibit modification of residential secured debt, and does not require that modified secured debt be paid in full within 3 or 5 years of the Plan. See *In re Seidel*, supra, and *In re Ivory*, 32 B.R. 788 (Bankr.Or.1983), (debtor may cure home mortgage default under the plan and deaccelerate the mortgage according to its terms). The only time limits on payment of secured debt are those which are implied by the present value language of 1225(a)(5), and the feasibility test of 1225(a)(6). Under 1225(a)(5), the rights of the nonconsenting secured creditor can be modified only if, among other things, the creditor retains its lien on the security and receives collateral with a present value not less than the allowed amount of the secured claim. What Section 1225(a)(5) does not permit, unlike 1129(b)(2)(A), is a cram down by using sales free and clear of liens, substitute liens or other forms of indubitable equivalent. It is also clear that the cram down provision of 1125(a)(5) significantly limits the secured creditors' rights by abolition of the absolute priority rule and the Section 1111(b) election right.

Under the Debtor's Plan in this case, the Powder River Bank does retain its lien on the collateral which it took as security for the loan. The issue in this case is whether the Bank is receiving under the Plan the value of the property, i.e., cash payments, distributed under the Plan which have a present value equal to the amount of its claim. Section 1225(a)(5)(B)(ii) is identical to 1325(a)(5)(B)(ii). *In re Trent*, 42 B.R. 279, 281 (Bankr.W.D.Va.1984) holds:

"11 U.S.C. § 1325(a)(5)(B)(ii) requires that a plan providing for an allowed secured claim must propose to distribute property thereunder on account of such claim in an amount the present value of which is not less than the allowed amount of such claim. This requires a determination of the time value of money to be paid in the future under the plan. More is required than that the sum of all payments made on account of a secured claim equal the allowed amount of that claim. Future payments to be made under the plan must be discounted to determine their 'present value' and the total of the present values of all payments made on account of a secured claim provided for under the plan must at least equal the allowed amount of that claim."

The discount rate is equivalent to the rate of interest that would be paid on an obligation of the Debtor considering a market rate of interest that reflects the risk of the Debtor's business. However, the discount rate is used to compute a factor that reduces money that will be paid in the future to a sum of money with a present value. If that sum earns interest at a rate equal to the discount rate, then the result of the future will equal the original amount of

money before discounting. The matter of proper interest or discount rate is addressed in *In re Welco Industries,* 60 B.R. 880, 882, 883 (9th Cir. BAP 1986) where the court held:

"The factors relevant in determining an appropriate interest rate are discussed in 5 *Collier on Bankruptcy,* ¶ 1129.03, at 1129–65 (15th Ed. 1982):

'The appropriate discount [interest] rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount rate [interest] rate, the court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration of the quality of the security and the risk of subsequent default.'

\*    \*    \*    \*    \*    \*

The appropriate interest rate is the prevailing market rate for the type and quality of loan. Current market conditions determine what the market rate will be. One factor that has an impact on that determination is the prime rate. Prime represents the rate charged by commercial banks to prime commercial loan customers. [*In re*] *Mitchell,* [39 B.R. 696] at 701 [Bankr.Or. (1984)]. Factors which influence the determination of prime are the general level of money rates, the availability of reserves, general business conditions, size and term of loan, geographic variations, elements of profits and collection costs."

To the same effect is *U.S. v. Neal Pharmacal Co.,* 789 F.2d 1283 (8th Cir.1986) and *In re Martin,* 66 B.R. 921, 927 (Bankr.Mont. 1986).

■ In the present case, the Debtor has failed to show that the proper discount or interest rate should be the rate of 8%. It appears that interest figure was merely pulled out of the hat and bears no resemblance to market interest rates required under *Welco.* Indeed, market rate on machinery and cattle may well vary from the market rate on land and certainly will vary on the attendant risk of the loan. The Debtor seems to acknowledge such when it

states in its brief that while the Debtor proposes an 8% rate it can pay higher if the Court so orders. I adopt the language from *In re Haukos Farms, Inc.,* 68 B.R. 428, 437 (Bankr.Minn.1986) where the Court correctly states the law as follows:

"It is not the proper business of the Bankruptcy Court to fashion a reorganization plan for a debtor, either at or before confirmation. Furthermore, a Bankruptcy Court cannot confirm parts of a plan and reject others. A plan proposed by a party must either be confirmed or rejected in its entirety."

Thus the Debtor's Plan must now rise or fall on its present contents, without modification or rewriting by the Court.

■ Whether the Plan is feasible will depend on the Debtor's modification on the rate of interest and term of the loan to be paid to Powder River Bank. On this issue I would comment that the Debtor shows cash funds in excess of Plan payments and operating expenses for each year of the Plan. The Debtor's rationale is that those excess or reserve funds are necessary for the succeeding year's operation to purchase feed, fuel, supplies, insurance and other necessities to sustain the on-going operation. While the Bank claims such reserve account violates the disposable income test of § 1225(b)(1), I do not agree. In the first place, the Bank is a secured creditor, and under 1225(b)(1) the only standing to challenge the disposable income requirement is the Trustee or an objecting unsecured creditor. It is evident such provision was intended to protect unsecured creditors, since 1225(a)(5) offers the protection for secured creditors. Moreover, disposable income is defined as income which is *not* reasonably necessary for the "payment of expenditures necessary for the continuation, preservation and operation of the debtor's business". 1225(b)(2)(B). It necessarily follows that some amounts of income will be required to sustain the operation, particularly since the operating loans formerly provided by the Bank have been terminated. Finally, since all unsecured creditors will be paid in full over the three year period there is no real cause to complain.

The Bank's desire to use a major portion of the excess operating income to retire the Bank debt earlier than 30 years is predictable, but such desire completely ignores the very purpose of Chapter 12—which is to keep the family farmer operating on the farm.

The proposed Plan, except for the loan term and rate of interest payable to the Bank, meets the requirements of § 1225 and would otherwise be confirmable. The Trustee's fees are properly computed on the basis of payments to be made to the creditors under the Plan. § 1202(d)(2). The fee is not to be computed on all income of the operation.

IT IS ORDERED the Chapter 12 Plan of the Debtor is denied confirmation, with leave to amend within ten (10) days of this Order.

IT IS FURTHER ORDERED that upon amendment of the Plan, hearing on the Amended Plan is set for Wednesday, May 20, 1987, at 9:00 o'clock A.M., Courtroom, Federal Building, Billings, Montana.