**In re Sidney Lee DUNNING, Doris Lee Dunning, Debtors.**

**Bankruptcy No. 87–40110.**

United States Bankruptcy Court,
D. Montana.

July 27, 1987.

Malcolm Goodrich, Billings, Mont., for Farm Credit Services (formerly FLB of Spokane).

Dunlap and Caughlan, Butte, Mont., Trustee.

## ORDER

JOHN L. PETERSON, Bankruptcy Judge.

In this Chapter 12 case, hearing on the Debtors' Chapter 12 Plan was held on June 30, 1987, together with objections to the Plan filed by Federal Deposit Insurance Corporation (FDIC) as liquidator of the First National Bank of Sheridan, Wyoming, and Farm Credit Services, formerly Federal Land Bank (FLB) of Spokane. The objections of FLB raise issues on valuation of the Debtors' collateral together with the interest rate proposed in the Plan. FDIC claims the Plan is not feasible and its debt is not a long-term obligation which may be extended beyond the time of the Plan as proposed by the Debtors.

Debtors own a ranch property for a cattle operation in Powder River County, Montana, consisting of 2,544 deeded acres together with two grazing leases, one from the State of Montana for 124 animal unit months and the other from the U.S. Forest Service for 3,069 animal unit months (AUMS). The Forest Service lease shows a carrying capacity over a 7 month term of 429 head. The deeded acres have a carrying capacity of 721 AUMS, so that the total carrying capacity of the ranch operation is 4,889 AUMS, which, based on a 12 month carrying capacity, equals 407 animal units. Animal unit is the annual feed required to maintain one mother cow. At the present time Debtors have an inventory of 280 cows and 50 heifers, which they plan to increase over the next 5 years. The ranch is being operated by the Dunning family, with the son of Sidney Dunning, performing the majority of the ranch work.

FLB is owed a debt of $348,964.53, based on a 20 year promissory note executed on February 28, 1983, with a variable rate of interest. The objection of FDIC is based

John A. Forsythe, Billings, Mont., for debtors.

Donald Quander, Billings, Mont., for FDIC.

on two separate notes, one dated March 3, 1986, for $42,000.00, with a current principal balance of $22,811.22, with interest at 14.5% per annum and secured by a residence separate from the ranch property located in Sheridan, Wyoming, and the other dated March 3, 1986, for the principal sum of $158,000.00, carrying interest at 14.5%, secured by livestock, machinery and equipment, and having a present balance of $136,510.39. Both FDIC notes matured and became payable on December 1, 1986, being before the date of the Debtors' Chapter 12 petition, which was filed on February 25, 1987.

■ FLB and Debtors presented expert appraisal testimony on the value of the Debtors' real property and leasehold interest. In summary, the testimony is as follows:

|  | Debtors | FLB |
|---|---|---|
| Land (deeded) | $144,640.00 | $157,859.00 |
| Improvements | 66,000.00 | 44,000.00 |
| Forest Service lease | 20,000.00 | 105,250.00 |
| State lease | None | 4,960.00 |
| Total | $230,640.00 | $314,960.00 |

As can be readily seen from these appraisals, the value of the deeded acreage is fairly close, while the big difference in the appraisal deals with valuation of the Forest Service lease. Debtor's appraisor fails to discuss the basis for the Forest Service lease in his appraisal, but gave testimony at the confirmation hearing that his estimate was based on the fact that the lease had only 3 years to run and would graze 350 head. Evidently, the appraiser felt the renewal of the lease was tenuous, thus leading to his value of $20,000.00. Debtors' appraiser does concede that "carrying capacity of the subject property is inflated by this lease as well as the school section that is leased for grazing purposes". Debtors concede the leases are an integral part of the ranch operation.

FLB's appraisal breaks down the carrying capacity by section, listing the AUMS for the deeded land at 721, for the state school lands at 124 and for the U.S. Forest Service permit at 3,069 AUMS. Thus, the Forest Service grazing permit accounts for 78% of the total grazing capacity of the ranch operation. The basis of the valuation of the Forst Service permit is fixed at multiplying 429 head, which the appraiser says is the carrying capacity of the permit, times $250.00 per head, being the value of a cow at the present time. The evidence shows, as noted above, that the Debtor presently have 280 cows, which, if one adopts the formula of the FLB appraiser, would put the present value of the Forest Service lease at $70,000.00. The Debtors did not dispute the $250.00 per head figure.

Considering all factors, including the general decline in agricultural land values plus a low number of available comparable sales within the last year (only 4 were used by FLB), I conclude that the valuation of the Debtors' land with improvements and leases is as follows:

| Land | – | $144,640.00 |
|---|---|---|
| Improvements | – | 44,000.00 |
| State School lease | – | 4,960.00 |
| Forest Service lease | – | 70,000.00 |
|  |  | $263,600.00 |

Since the Debtors' Plan is based on valuations of these assets totaling $230,000.00, the Plan will have to be amended to reflect the above values.

■ The next issue deals with FDIC's contention that its debt, maturing before the petition date, is a short term obligation which, being fully secured, must be paid under the Plan within the 5 year Plan period. The Plan fixes the claim at $157,976.00 to be repaid over 15 years at 9% interest[1] per annum at annual installments of $19,-602.00 per year. The Proof of Claim filed by FDIC, without objection by the Debtors, totals $159,321.60, and thus the Plan is inaccurate in that regard. The issue then resolves itself into the question posed by FDIC—over what time period may a Chapter 12 debt be rescheduled, when that debt came due by its terms in advance of the filing of the bankruptcy case? If the debt has to be retired by payment within the term of 5 years, the approximate annual payment would be $43,600.00, which renders the Plan not feasible because the

1. The parties have now stipulated that a reasonable interest rate would be 11.5%.

Debtors' projected income, under the plan shows net income of $46,539.00. Debtors concede that in light of a better cattle market the projected income of $95,817.00 should be increased to $111,000.00, thus increasing the net income available for creditors to $61,722.00. Of that amount, the Plan projects payments to FLB (interest only for the first 5 years) of $20,700.00, which must now be increased to $23,724 in lieu of the above finding on valuation, thus leaving only $37,998.00 to fund the FDIC debt, assuming its position is adopted by the Court.

FDIC relied upon this Court's statement in the case of *Janssen Charolais Ranch, Inc.*, 73 B.R. 125, 126, 127, 4 Mont.B.R. 290 (Bankr.Mont.1987). The language relied upon by FDIC is:

"Plan provisions may include under 1222(b)(3) and (5) the right to '(3) provide for the curing or waiving of any default' and '(5) provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured or secured claim on which the last payment is due after the date on which the final payment under the plan is due'. In this circuit, a like provision of 1322(b)(5) has been interpreted to deal with long-term debt. *In re Fontaine*, 27 B.R. 614, 615 (9th Cir. BAP 1982) holds:

'The legislative history of this section states:

"Paragraph 5 concerns long-term debt." H.R. 95–595, 95th Cong., 1st Sess. (1977), U.S.Code Cong. & Adm. News 1978, pp. 5787, 6314.

Therefore, only default on long-term debt is curable under 1322(b)(5). The definition of long-term is found both in the legislative history and the section itself. Long-term debt is "[a]ny unsecured or secured claim on which the last payment is due after the date on which the final payment under the plan is due". 1322(b)(5) and H.R. 95–595, 95th Cong. 1st Sess. (1977), U.S.Code Cong. & Adm.News, 1978, P. 6384.'

When a debt has been fully matured by its own terms before a Chapter 12 is filed, it is not long term debt within the meaning of 1225(b)(5). When a debt is a mortgage on real property for an extended period of time, it is a long term debt under 1322(b)(5) even if it has been reduced to judgment on foreclosure. *In re Seidel*, 752 F.2d 1382, 1386–87 (9th Cir. 1985)."

The discussion in *Janssen* was dicta, and did not result in denial of confirmation of the proposed plan in that case. Indeed, the decision notes the secured creditors suggested a term of years payment in excess of the plan term even though the notes for operating loans had fully matured before the filing of the Chapter 12 case. In reflection upon the matter, I conclude that Sections 1222(b)(2), (5) and (9) allow for fully matured notes to be restructured beyond the term of the plan. Section 1222(b)(9) specifically settles the issue because it allows restructure in accordance with Section 1225(a)(5) by providing the plan may "(9) provide for payment of allowed *secured* claims consistent with Section 1225(a)(5) of this title, over a period exceeding the period permitted under Section 1222(c);". (Emphasis added). Section 1222(c) states a plan shall not provide for payments over 3 years, unless the court extends the plan term to five years. There is no parallel provision in Chapter 13 like Section 1222(b)(9). As long as the plan upon confirmation provides that the secured creditors will retain the lien securing the claim and be paid present value of the allowed claim, the plan passes muster. In sum, two types of plan provisions are excepted from the provisions of Section 1222(c), namely (1) those providing for the cure of default on any unsecured or secured claim having a final payment due after the plan's final payment [Section 1222(b)(5)], and (2) those providing for payment of allowed secured claims consistent with Section 1225(a)(5) [Section 1222(b)(9)]. Thus, the real inquiry in each case where the secured debt is to be extended beyond the term of the Plan is whether one of the two provisions just enumerated apply. Under Section 1222(b)(9), the debt may be restructured even though it matured before the filing date of the petition. As stated in

*Janssen,* which language is pertinent to the present controversy:

"The only time limits on payment of secured debt are those which are implied by the present value language of 1225(a)(5), and the feasibility test of 1225(a)(6). Under 1225(a)(5), the rights of the nonconsenting secured creditor can be modified only if, among other things, the creditor retains its lien on the security and receives collateral with a present value not less than the amount of the secured claim." *Id.* at 127.

The objections of the FDIC on this issue are therefore rejected.

■ The remaining issue as to the FDIC claim is the term of repayment. It is true that a portion of the debt is secured by real property, being a family residence not associated with the farming operation. That collateral could be surrendered to FDIC at its fair market value, which FDIC fixes at $32,000.00, or it can be paid over a period of 10 to 15 years since it is a lien on real estate, and such real estate liens normally extend up to 20 years. As to the balance of the debt, it is secured by livestock worth at least $178,000.00, farm machinery valued at $5,750.00 and inventory of $4,500.00, according to values fixed by the FDIC. FDIC has a valid argument, however, that the normal term of loans on such chattels should not exceed 5 to 7 years. Since the Plan will have to be modified due to the above decisions, I leave it to the Debtors to more fairly restructure the FDIC claim in light of the present record, keeping in mind, as stated in *Janssen,* supra at 128, it is not the business of the Court to fashion a reorganization plan, for the plan "must rise or fall on its present contents, without modification or rewriting by the Court".

IT IS ORDERED the Debtors' Chapter 12 Plan is denied confirmation with leave to amend within 14 days.