In re Gary L. CONLEY, Debtor.

**EXTEL CORPORATION, Plaintiff,**

v.

**Gary L. CONLEY, Defendant.**

**Bankruptcy No. 86–10924.
Adv. No. 86–1223.**

United States Bankruptcy Court,
D. Massachusetts.

Sept. 22, 1987.

**4**

John P. Connelly, Hutchins & Wheeler, Boston, Mass., for plaintiff.

Gary D. Thomas, Kelly, Kethro, Flannigan & Thomas, P.C., Hanover, Mass., for defendant.

## MEMORANDUM

JAMES N. GABRIEL, Chief Judge.

The matter before the Court is the Amended Complaint of Extel Corporation ("Extel"). Extel obtained a default judgment against the Debtor, Gary L. Conley ("Conley" or the "Debtor") in February of 1986 in Harris County, Texas in the amount of $88,486.03 plus costs and attorneys' fees. Extel now seeks a determination that obligations incurred by Anset Systems Corporation ("Anset") and guaranteed by Conley in the amount of $88,486.03 are nondischargeable debts of Conley pursuant to 11 U.S.C. § 523(a)(2)(A).

Extel bases its complaint on the Debtor's alleged forgery of his ex-wife's signature on a personal guaranty. Conley asserts that Extel did not require his ex-wife to sign the guaranty, that it did not reasonably rely on her signature and that Extel suffered no damages since the guaranty in question guaranteed a contract that expired on December 31, 1984 and that all of the amounts outstanding at the time of Anset's dissolution were incurred after the contract expired.

The Court tried the case on May 6, 1987 and June 16, 1987. Four witnesses testified, including Patrick Spain ("Spain"), vice president and general counsel of Extel, Tanya Conley, the Debtor's ex-wife, Joan McCann ("McCann"), a certified handwriting and document examiner, and the Debt-

or. Ten plaintiff's exhibits and four defendant's exhibits were admitted into evidence by the Court.

## FACTS

Conley filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code on June 20, 1986. Prior to taking up residence in Massachusetts, Conley lived in Houston, Texas. In July of 1982, Conley together with several other individuals formed a corporation known as Anset Systems Corporation to sell and service communication and data processing terminals. Conley owned 70% of the stock of Anset and served as its president. Conley also formed Anset Financial Corporation and Bankers Leasing, two entities that, among other activities, leased equipment to Anset's customers.

On January 1, 1984, Anset per its president Conley, entered into a non-exclusive, one year distribution agreement with Extel, a company that designs, manufactures and sells communication terminals.[1] By the terms of the distributorship agreement, Anset agreed "[t]o supply to Extel, upon request, distributor's most current financial statements and, if Extel deems itself insecure to provide guarantees of distributor's principals or affiliates, as Extel may require." Presumably in accordance with this provision, on January 10, 1984, Anset Financial Corporation guaranteed the debts of Anset. Extel supplied a form of guaranty to Conley that he modified and then signed as president of Anset Financial Corporation. Significantly, the corporate guaranty, as well as the subsequent guaranty at issue here, which was executed by Conley personally on August 14, 1984 and to which Conley allegedly forged his ex-wife's signature, indicates that it was undertaken pursuant to distributorship agreement No. 0113. However, that distributorship agreement did not come into existence until January of 1985. Spain testified that

---

1. Paragraph 10.A of the distribution agreement provides:

This Agreement shall become effective on the date of execution by Extel and shall remain in effect until December 31, 1984 subject to the right of either party to cancel it upon thirty (30) days written notice to the other party. This Agreement shall not automatically renew and may only be renewed by the express written agreement of the parties....

it was his assumption that either Extel's credit manager or a staff member in Extel's credit department inserted the number 0113 on both the corporate and personal guaranties. Conley indicated that he had no idea how the number of a distribution agreement that only came into existence in 1985 came to be applied to guaranties executed in 1984.

Spain testified that Extel required Conley and his ex-wife Tanya[2] to guarantee Anset's obligations when Anset's obligations to Extel exceeded $30,000. According to Spain, it was standard procedure for Extel in community property states such as Texas to require, indeed to insist, that both husband and wife sign a guaranty, particularly "where, as in their case, there was a home owned which was owned in both parties' names." On cross-examination Spain admitted that he had no first hand knowledge that the Conleys owned their own home, but that he was told by a salesperson that the Conleys owned a home. Parenthetically, Tanya Conley revealed that the home was worth approximately $80,000 and was encumbered by a mortgage in the amount of $92,000. Spain also testified that the August 14, 1984 guaranty was clearly intended to continue past 1984 and that if Extel had not received the personal guaranty of both Conley and Tanya it would have ceased selling equipment to Anset and would not have entered into a distributorship agreement in 1985.

Conley's recollection of the circumstances surrounding the August 14, 1984 guaranty is at odds with that of Spain. Conley testified that he couldn't recall whether the guaranty was required or offered. However, he indicated that it was prompted by his desire for a credit extension for Anset so that the company could fulfill a large order placed by Occidental Petroleum Corporation. Moreover, Conley testified that it was his understanding that the personal guaranty, which he had typed but which was almost identical in form and substance to the January 10, 1984 corporate guaranty supplied to him by Extel, expired at the

same time as the existing distribution agreement or earlier.

Neither the August 14, 1984 guaranty nor the correspondence between these parties refers to the duration of the guaranty. In a letter dated August 15, 1984, Conley wrote to Spain stating: "It is my understanding that the personal guaranty will be removed at the earliest point in which Anset demonstrates its ability to maintain an adequate credit record with Extel." In response to Conley's August 15, 1984 letter, Spain replied:

> As I indicated to you, Extel is prepared to release the personal guarantee at such time as your credit record with Extel warrants it. While this is necessarily a somewhat subjective analysis, the areas which Extel will be monitoring are: a) prompt payment of current invoices; b) meeting the repayment schedule for past due invoices; c) level of credit requested.

With respect to the authenticity of Tanya's signature on the August 14, 1984 guaranty, Tanya testified that she did not sign the guaranty. McCann testified that in her professional opinion, the handwritten name, Tanya Conley, was not a genuine signature and that it was "highly probable" that the hand that penned the Tanya Conley name was the same hand that penned the signature above hers on the guaranty, i.e., that of the Debtor. The Debtor testified that he could not honestly remember having signed his ex-wife's name or not having signed it, but that he certainly would not have signed it with ill intent.

Extel claims that it is owed a total of $88,486.03 or, alternatively, at least $24,814.22 from invoices issued prior to December 31, 1984. It bases these amounts upon a statement it prepared dated May 26, 1985. The statement purportedly shows all unpaid invoices from December 21, 1983 through May 22, 1985. The statement, however, does not reflect payments or credits made by Anset. Conley disputes the accuracy of the statement. At trial, he

---

**2.** Tanya Conley testified that she married the Debtor in April of 1980. The couple divorced in September of 1985.

maintained that Extel frequently failed to credit Anset for equipment returns. Conley testified that Anset was generally current in paying its bills and had an average balance with Extel of $20,000–$30,000. According to Conley, Anset fell behind in the payments to Extel in late March or early April of 1985 because of a poor economic climate in Houston and the negative effects of changing technology on Anset's market. Ostensibly, as a result of these problems, Anset went out of business in June of 1985, its assets, books and records having been seized by the Rosenberg Bank & Trust Company. However, Conley, testifying from memory, indicated that at the end of 1984, Anset only owed Extel between $20,-000 and $25,000.

Conley also testified about a round trip vacation for two that he was awarded in March of 1985 for being the best salesperson in his region. To be eligible for the trip, Conley indicated that at the end of 1984 Anset had to be in compliance with all conditions of the distribution agreement, that he had to have achieved the quota established for Anset and that Anset had to be current with its accounts. He also asserted that it was his understanding, contrary to that of Spain, that remittances were applied by Extel to the oldest aged invoices and that as a consequence, Anset had no unpaid invoices for 1984 when it went out of business in 1985. There was no testimony contradicting Conley's about qualifications for the trip.

## DISCUSSION

Section 523(a)(2)(A) of the Bankruptcy Code provides:

A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. . . .

11 U.S.C. § 523(a)(2)(A).

As this Court noted in *In re Bombard*, 59 B.R. 952 (Bankr.D.Mass.1986), the party objecting to a debtor's discharge must establish the following elements:

'1) That the debtor made materially false representations; 2) that the debtor knew the representations were false at the time he made them; 3) that the debtor made the false representations with the intention and purpose of deceiving the creditor; 4) that the creditor reasonably relied upon the debtor's materially false representations; and 5) that the creditor sustained loss and damages as a proximate result of the materially false statements.'

*Id.* at 954 *quoting In re Dixie-Shamrock Oil & Gas, Inc.* 53 B.R. 262, 266 (Bankr.M.D.Tenn.1985). *See also In re Hunter*, 780 F.2d 1577, 1579 (11th Cir.1986); *In re Taylor*, 514 F.2d 1370, 1373 (9th Cir.1975); *In re Gans*, 75 B.R. 474, 482–83 (Bankr.S.D.N.Y.1987); *In re Cokkinias*, 28 B.R. 304, 306 (Bankr.D.Mass.1983). Since exceptions to discharge should be liberally construed in favor of the debtor, *In re Gans*, 75 B.R. at 481; *In re Bombard*, 59 B.R. at 954; *In re Cokkinias*, 28 B.R. at 306, each of the five elements must be proven with clear and convincing evidence. *In re Phillips*, 804 F.2d 930, 932 (6th Cir.1986); *In re Gans*, 75 B.R. at 481; *In re Bombard*, 59 B.R. at 954; *In re DeRosa*, 20 B.R. 307, 310 (Bankr.S.D.N.Y.1982).

Applying these standards to the instant case, it is obvious to the Court that Extel has failed to prove all five elements with clear and convincing evidence. Even assuming that Conley forged his wife's signature to the guaranty he signed on August 14, 1984 with the intention of deceiving Extel, it is clear to the Court that Extel failed to prove reasonable reliance and the amount of damages it suffered as a result of Conley's forgery.

Spain testified that Extel required both Conley's and Tanya's signatures on the guaranty because Texas is a community property state and that Extel would not

have extended additional credit to Anset without their personal guaranty of Anset's obligations. Although the Court cannot find that Extel did not rely on Tanya's signature, the Court must find that Extel's reliance was unreasonable. Spain indicated that he learned from a company salesman that the Conleys owned their home. Extel had no information about the Conleys' financial condition. In view of the possibility that the Conleys had no equity in their home, Extel's reliance on both the uncorroborated statement of a salesman and Tanya's signature was unreasonable.

In addition to Extel's unreasonable reliance, the Court notes that there was conflicting testimony about whether Tanya's signature was or was not required. Although the Court is persuaded that the signature probably was required, the conflicting testimony on this point buttresses the Court's conclusion that Extel failed to prove it reasonably relied on Tanya's signature in extending credit to Anset. Extel's argument that it did not conduct a more thorough financial background check on the Conleys because of time pressure imposed by the Debtor as a result of Anset's pending deal with Occidental Petroleum does not move the Court. Indeed, the Court could just as easily infer that such pressure should have made Extel wary of extending credit to the Debtor based on his and his wife's signature and the salesman's report that they owned their own home.

With respect to the damages suffered by Extel, the Court is unable to find that Conley's guaranty of the 1984 distribution agreement extended to the 1985 distribution agreement. The distribution agreements by their express terms were limited in duration and were not to be automatically renewed. Extel, recognizing that the Court might reach just that result, suggests that $24,814.22 was outstanding on the 1984 invoices. Although Spain testified that Extel's practice was to credit current invoices first, thereby permitting Extel to determine that $24,814.22 was due on 1984 sales to Anset, the Court notes that Conley testified to the contrary. Moreover, Conley's testimony relative to his Mexican vacation was unrebutted. Again, in view of

the conflicting testimony as well as Conley's testimony that Extel frequently made accounting errors, the Court cannot find that Extel established that it suffered a loss as a proximate result of Conley's forgery or that it established the amount of its loss with sufficient certainty.

In view of the foregoing, the memoranda and arguments of counsel whether or not specifically mentioned herein, the Court hereby enters judgment in favor of the Defendant/Debtor.

SO ORDERED.