In re Robert S. FOSTER, Nancy C. Foster d/b/a B–N Ranch, Debtors.

Bankruptcy No. 87–20125.

United States Bankruptcy Court, D. Montana.

Nov. 5, 1987.

See also, Bkrtcy., 79 B.R. 488.

Dunlap & Caughlan, Butte, Mont., Trustee.

J. Robert Planalp, Landoe, Brown, Planalp, Kommers & Johnstone, Bozeman, Mont., for Montana Bank of Bozeman.

Court E. Ball, Towe, Ball, Enright & Mackey, Billings, Mont., Robert L. Jovich, Livingston, Mont., for Beneficial Finance.

J. Richard Orizotti, Poore, Roth & Robinson, Butte, Mont., J.C. Yarde, Representative First Bank of Bozeman, Bozeman, Mont., for Navistar Fin. Corp.

William L. Madden, Bozeman, Mont., for debtors.

W. Arthur Graham, Missoula, Mont., for FLB.

J. David Penwell, Bozeman, Mont., for Slingsby.

James J. Screnar, Nash, Guenther, Zimmer & Screnar, Bozeman, Mont., William Schreiber, Belgrade, Mont., for Williamson.

James E. Purcell, Henningsen & Purcell, Butte, Mont., for Deutz–Allis.

## ORDER

JOHN L. PETERSON, Bankruptcy Judge.

Hearing on Debtors' Amended Chapter 12 Plan was held on July 1, 2 and 8, 1987. Objections to the Plan were filed by creditors Williamson and Vadheim (Vadheim), Federal Land Bank of Spokane, now Farm Credit Services, (FLB), Montana Bank of Bozeman (Bank),[1] Slingsby, Beneficial Finance Company, Deutz–Allis, Navistar and First National Bank in Bozeman. The ob-

---

1. Post-hearing, the Debtor changed the annual payment to the Bank due to a decrease in the valuation of the collateral to reflect a change in position of the perfected security interest of the Bank. The change is nominal and will have to be addressed in subsequent amendments due to this order.

jections raise issues on valuation of the collateral, proper market rate of interest and validity of an alleged perfected security interest of the Bank in the 1987 crop.

Under the Amended Plan, the Debtors propose to pay over three years sums of $50,138.00 (year 1), $50,459.00 (year 2) and $42,789.00 (year 3), which provides net disposable income to unsecured creditors totaling $17,736.10. Payments to secured creditors, priority claims and Trustee fees for the first three years total $125,649.90, with secured creditor obligations restructured thereafter up to terms of 30 years.

The Debtors' real property holdings consist of agricultural land on which they raise crops and platted residential building sites. The farm property presently in use and tilled consists of 473 acres, of which 356 acres are irrigated cropland, 111 acres grazing land and 6 acres wild hay land. The Debtors' Plan proposes to continue farming on the 473 acres. The subdivision tracts consist of three platted areas described as the Foster Park Subdivision, the Reese Creek Estates and Buffalo Creek Subdivision. Foster Park is presently subdivided in 5 one acre, 6 two acre parcels and 2 five acre tracts. The Reese subdivision consists of 5 lots, some now sold under contracts which are non-performing. Buffalo Creek consists of two five acre tracts.

Three secured creditors, the Bank, Slingsby and Beneficial Finance, have filed objections to the Debtors' valuation of the tracts. The Bank holds a second lien position to FLB on 117 acres of farmland located in Section 34, T2N, R5E, Gallatin County, Montana. The Bank also holds a first lien position on 10 acres located in Section 2, T1S, R5E, Gallatin County, Montana, located next to the home place, which is the Debtors' residence. Slingsby sold 117 acres to the Debtors on August 31, 1982, under a Contract for Deed for a total purchase price of $208,500.00, which property is also located in Section 2, and is used presently as farm ground. The Slingsby's debt is presently $196,165.40. Beneficial Finance holds a second mortgage position to a contract seller Stimpson on 190 acres, called the home place, located in Section 2, which is presently used for farming.

■ Each party introduced appraisal testimony on valuation based on a market data or comparable sale approach. The valuations vary greatly not only by reason of the opinion evidence on the value of agricultural acreage, but value of the highest and best use ascribed to the property by each appraiser. Section 11 U.S.C. § 506(a) governs the proper approach to valuation as held in *In re Robinson Ranch*, 75 B.R. 606, 4 Mont.B.R. 411 (Bankr.Mont. 1987). *Robinson* states, *Id.* 75 B.R. at 608–09, 4 Mont. at 414–15:

"The starting point on valuation is Section 506(a) of the Code which states:

'§ 506. Determination of secured status.

(a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.'

In Chapter 12 cases where the property will be held as a going-concern for the production of income to pay reinstated mortgages and subsequent debts, the value under 11 U.S.C. 506(a) should be based on a fair market value, not a liquidating value. *In re Yoder*, 32 B.R. 777 (Bankr.W.D.Pa.1983); *In re Fursman Ranch*, 38 B.R. 907, 909 (Bankr.W.D.Mo. 1984):

'This court is obliged to value collateral "in light of the purposes of the valuation and of the proposed disposi-

tion or use of such property, and in conjunction with any hearing—on the plan affecting such creditor's interest". The legislative history suggests that the valuation is to be made on a case by case basis, consistent with the time of the valuation. Senate Report No. 95–989, 95th Cong.2d Sess. (1978) 68, U.S.Code Cong. & Admin.News 1978, p. 5787, reported in App. 3 *Collier on Bankruptcy*, (15th Ed.); * * *"

See also *In re Martin*, 66 B.R. 921, 927 (Bankr.Mont.1986). The valuation for the purposes of 1225(a)(5)(B)(ii) is to be fixed 'as of or close to the effective date of the Plan'. *In re Cook*, 38 B.R. 870 (Bankr.Utah 1984). In regard to value, *In re Courtright*, 57 B.R. 495, 496 (Bankr.Or.1986), states:

'The court believes that it should start with the fair market value of the property as that term is generally understood to be, i.e., the price which a willing seller under no compulsion to sell and a willing buyer under no compulsion to buy would agree upon after the property has been exposed to the market for a reasonable time. The court should not use that value which would be obtained through a forced or quick sale.'

The appraiser for Metropolitan expanded on such definition to include that the buyer should be knowledgeable of all uses and purposes for which the property is adopted and for which it was or is capable of use. Three approaches to fair market value are generally recognized, to-wit: (1) the market data or comparable sales approach; (2) the income approach, and (3) the cost or replacement approach."

*Robinson,* supra, and *In re Cormier*, 75 B.R. 692, 4 Mont.B.R. 224, 225 (Bankr. Mont.1987) further stand for the proposition that under Section 506(a), the Debtors' proposed use of the property should be utilized by the appraiser, rather than speculating on uses different from those proposed in the Plan. That proposition is crucial in this case because appraisals of the Bank and Beneficial adopt the "highest and

best use" as the market value in fixing valuation based on subdivided tracts or rural homesites rather than agricultural use. For example, Beneficial's appraiser stated the subject property (190 acres) consists of fourteen 10 acre parcels, which are unimproved and presently being used for agriculture, yet he values the tracts for use as subdivision tracts. The appraisal also erroneously stated the additional acreage consists of 70 acres, whereas the balance of the tract is in truth only 50 acres. In contrast, the Debtors' appraiser valued the entire 190 acres on the basis of an agricultural use as proposed in the Plan. The difference in the appraisal is dramatically shown by comparison of the final appraised amount of $322,000.00 by Beneficial to $99,618.00 by the Debtors. I find and conclude the appraisal on Debtors' property used as agricultural land should be valued as agricultural use. Even then, a wide disparity exists in the record as to the per acre value of agricultural property in the area of the subject property.

The Debtors' appraisal fixed the per acre value of the agricultural property as follows:

| | | |
|---|---|---|
| Irrigated cropland | – | $322.20 |
| Grazing land | – | 191.45 |
| Wild hay ground | – | 222.00 |

The value of improvements consisting of residence, barn, garage and grain bins was fixed at $40,800.00. Beneficial fixed the improvements at a value of $35,000.00 as a "conservative" value. I find and conclude the improvements have a value of $40,800.00.

The valuation of the farm lands directly affects the secured status of the Bank, Beneficial and Slingsby, each of which are treated under the Plan as undersecured creditors. For example, the contract seller Slingsby has a present debt due of $196,165.40, which the Debtors treat as secured in the sum of $40,774.00 (real property—$36,974.00 and personal property of $3,800.00). Slingsby, on the other hand, claims the value of the agricultural land of

117 acres is worth $1,000 per acre.[2] They concede the land has depreciated in value since sale, *see, In re Robinson Ranch*, supra, at 417. The Debtors' appraiser valued the agricultural lands based on his review of comparable sales, as did the appraiser of the Bank and Slingsby.

A key comparable sale by each party was a 160 acre tract sold in April, 1987, for $144,000.00, being 154 acres of sub-irrigated cropland. Two appraisers using the sale discounted the $900 per acre price as it applied to the Debtor's property because of topography, soils difference, size and access. Upon discount, the Debtors' appraiser lowered the per acre value to $331.60 for irrigated land, $195.00 for grazing land and $227.50 for wild hay ground. The creditor's appraisal discounted the $900.00 figure to $765.00 per acre, without breaking out the particular type of land use. In that regard, certainly irrigated land has more value than grazing or dry land acreage. Nevertheless, based on a review of the entire record, I find the value fixed by the Debtors' appraiser for irrigated cropland is too low in the existing market. Therefore, I find and conclude the fair market value of the agricultural land of the Debtors is as follows:

| | | | | |
|---|---|---|---|---|
| Irrigated cropland | — | 359.41 acres at $540.00/acre | = | $194,081.40 |
| Grazing land | — | 111.20 acres at 191.45/acre | = | 21,289.00 |
| Wild hay land | — | 6.00 acres at 222.00/acre | = | 1,332.00 |

The irrigated cropland is of fair quality due primarily to the water right, which is a flood right of intermittent use, so that in some years availability of water is non-existent. Thus a reduction of 40% from the comparable sale of $900.00 per acre is more properly applicable to the subject property.

As to the other valuation of land, the evidence is in dispute only on one 10 acre parcel adjoining the home place. On that tract, which is to be used for agricultural use under the Plan, the Bank fixes a subdivision value, or rural homesite value. I reject that approach because its use will continue to be agricultural under the Plan. No other issues on the subdivision lands have been presented by the evidence, and accordingly I find and conclude values as follows:

| | | | |
|---|---|---|---|
| Five one acre tracts | @ $ 5,236.00 – | | $26,180.00 |
| Six two acre tracts | @ 8,470.00 – | | 50,820.00 |
| Four five acre tracts | @ 11,050.00 – | | 44,200.00 |
| Reese Subdivision lots | | | |
| —4 | @ 5,544.00 each | | |
| and 1 | @ 7,700.00 – | | 29,876.00 |

In addition to the Bank's lien on real property, the Bank has additional collateral in the form of an assignment of the Debtors' interest in land sold under contract to Knight, which balloons in September, 1987, in the amount of $27,498.00. This land was part of the Vadheim land purchase, and the Debtors valued the receivable at zero because upon payment to Foster by Knight, Foster must in term pay Vadheim $60,000.00 in order to secure release of the title to Knight. Knight's contract allows Knight the unilateral right to apply his payments to the Vadheim contract. Under these facts, the Debtors have properly valued the Knight receivable. The same reasoning applies to the Mallette contract for sale of the Debtors' property. The Plan valued the Mallette receivable at $10,771.20, which is true value of the Bank's interest in the contract. The Bank and Debtors have agreed on values of present property for the irrigation equipment ($10,800.00), miscellaneous equipment ($4,000.00) and bins ($3,500.00).

Objections also raise issues dealing with items of collateral on personal property involving farm machinery and used automobiles. Equipment appraisers for the Debtors and creditors gave conflicting opinions on value. As to the vehicles, I

**2.** Post-hearing, after the record was closed, Slingsby attached an affidavit from a realtor regarding a sale of property allegedly made on July 30, 1987. The affidavit has been disregarded as hearsay by the Court and is given no probative value.

find the value of the 4 vehicles (1966 Dodge, 1980 Buick and two 1978 Wagoneers) at $1,400.00, due to the age and condition of the vehicles. Deutz–Allis argues, based on testimony of its equipment expert and official farm equipment guide, the value of the Allis–Chalmers 440 Tractor should be $4,817.00, since the guide values the tractor at $10,073.00 (average loan value). Debtors value the tractor at $1,685.00, due to its present condition. The Duetz–Allis appraiser relied solely on the guide, without inspection of the tractor, and thus the Debtors' evidence is more credible. I fix the value of the 440 Tractor at $1,685.00. Navistar's expert pegged the New Holland 1400 combine, which he inspected in its "as is" condition at $10,594.00, less cost of repairs of at least $4,000.00, for a net sale value of $5,000.00. Debtors' expert fixed the "as is" condition at $2,450.00. Since the book value from the official guide must be disregarded as conceded by both appraisers due to the condition of the combine, I find the value to be $2,450.00 for the 1400 combine. Finally, the present value of contract receivables was admitted into evidence without contradiction, and thus the total value of contract receivables from land sales is fixed at $90,512.71.

■ The next issue to be addressed has to do with the restructure of the Williamson–Vadheim Contract for Deed. The contract is fully secured by a lien on 159 acres of real property, but matured on August 1, 1987, when a balloon payment of $127,000.00 was due. The Plan now seeks to restructure the balloon payment over 30 years at 8½% interest per annum, or $11,896.00 per year. The Vadheim agreement has been paid down since 1977 from $202,500.00, and calls for annual payments of $16,284.00 for ten years, at 7% interest. The sellers are elderly individuals, who intended in 1977, the contract be paid in full in 10 years. Vadheim's position is that the restructure of such debt is beyond the "accepted practice in the Gallatin Valley and does not meet the good faith requirement of 11 U.S.C., Section 1225(a)(3)—in that terms should not exceed what is reasonable in the market place". The Debtors pur-

chased the property for subdivision, and have in part subdivided and sold parcels from the tract, while retaining the balance for agricultural use. Vadheim's expert opinion testimony was to the effect that Contract for Deed of this type never exceed 10 to 15 years, even though they may be amortized over periods of 20 to 35 years with a balloon payment. The legal issue has been addressed in *In re Dunning*, 77 B.R. 789, 4 Mont.B.R. 505, (Bankr.Mont. 1987), dealing with extension of matured secured claims beyond the term of the Plan. *Dunning* states:

"* * * I conclude that Sections 1222(b)(2), (5) and (9) allow for fully matured notes to be restructured beyond the term of the plan. Subsection 1222(b)(9) specifically settles the issue because it allows restructure in accordance with 1225(a)(5) by providing the plan may '(9) provide for payment of allowed *secured* claims consistent with Section 1225(a)(5) of this title, over a period exceeding the period permitted under Section 1222(c);'. (Emphasis added). Section 1222(c) states a plan shall not provide for payments over 3 years, unless the court extends the plan term to five years. There is no parallel provision in Chapter 13 like 1222(b)(9). As long as the plan upon confirmation provides that the secured creditors will retain the lien securing the claim and be paid present value of the allowed claim, the plan passes muster. In sum, two types of plan provisions are excepted from the provisions of 1222(c), namely (1) those providing for the cure of default on any unsecured or secured claim having a final payment due after the plan's final payment [1222(b)(5) ], and (2) those providing for payment of allowed secured claims consistent with § 1225(a)(5) [1222(b)(9) ]. Thus, the real inquiry in each case where the secured debt is to be extended beyond the term of the Plan is whether one of the two provisions just enumerated apply. Under 1222(b)(9), the debt may be restructured even though it matured before the filing date of the petition. As stated in *Janssen*, [73 B.R. 125, 4 Mont.

B.R. 290], which language is pertinent to the present controversy:

'The only time limits on payment of secured debt are those which are implied by the present value language of 1225(a)(5), and the feasibility test of 1225(a)(6). Under 1225(a)(5), the rights of the nonconsenting secured creditor can be modified only if, among other things, the creditor retains its lien on the security and receives collateral with a present value not less than the amount of the secured claim.' *Id.* at 127."

*Dunning* further addressed the term of repayment, stating that liens secured by real estate may extend up to 20 years. In the present case, Vadheim's evidence shows that in Contract for Deed situations, the normal term is 10 to 15 years, amortized over 20 years, with a balloon payment at 10 years. The Plan projects a repayment term of 30 years at an interest rate of 9%, on the theory that Chapter 12 contains no time limits on the extension of secured claims, so long as the secured creditor receives present value in deferred cash payments, retains the lien on the collateral and the Plan is feasible. Debtors concede that their income stream will service the debt only if extended over 30 years. In a case dealing with a similar, but not identical situation, *In re Timber Tracts, Inc.,* 70 B.R. 773, 4 Mont.B.R. 122 (Bankr.Mont. 1987), a plan term of 10 years payable at 11% was approved, where the secured creditor was substantially oversecured. Based on the evidence in the case *sub judice,* even where the contract interest rate is increased and the value of the security substantially exceeds the debt except for FLB, I find the term of repayment of 30 years is not supported by the evidence. I exclude FLB since that agency has historically placed loans up to 40 years, and thus has set its own market criteria. Based on the present record, an amortization of the other secured debt based on a 30 year payment with a balloon at 15 years would be acceptable, but there is no evidence in the record that the Debtors would be in a position to pay the balloon at the end of 15

years. *See, In re Conley,* 78 B.R. 3, 4 Mont.B.R. 260, 277–79 (Bankr.Mont.1987).

The next issue involves the proper market rate of interest. I quote from *In re Janssen Charolais Ranch, Inc.* (Janssen II), 73 B.R. 125, 126 (Bankr.Mont.1987):

"In discussing the interest rate issue in the previous opinion, the Court relied upon *In re Welco Industries,* 60 B.R. 880, 882–883 (BAP 9th Cir.1986). Since the original decision, the Ninth Circuit Court of Appeals has now rendered a decision in three consolidated bankruptcy cases on the issue of 'what rate of interest on deferred payments of federal taxes will provide the government with payments having a present value to the allowed amount of its claim as required by 11 U.S.C. § 1129(a)(9)(c)'. *In re Camino Real Landscape Maint. Contractors, et al.,* 818 F.2d 1503, 1504 (9th Cir.1987). The issue of present value is the same in the case *sub judice,* for, as the Circuit Court noted, ' * * * Congress used the phrase "value, as of the effective date of the plan" in other sections of the Bankruptcy Code that have nothing to do with deferred payment of taxes' so that 'Congress presumably intended the phrase to have a single meaning in all cases, including this one. *Neal [Neal v. U.S. Pharmacal Co.],* 789 F.2d [1283] at 1288–89 [ (8th Cir.1986) ]; *Southern States [In re Southern States Motor Inns ],* 709 F.2d [647] at 651–52, N. 6' [ (11th Cir.1983) ]. *Id.* at 1506–07. The Circuit Courts which have thus rendered a decision on the issue are in consistent agreement that the proper market rate of interest must be decided on a case-by-case basis, from a standard which applies a rate 'the debtor would pay a commercial lender for a loan of equivalent amount and duration, considering the risk of default and any security'. *Id.* at 1504. *Camino Real* made other observations in adopting the 'open market' standard, namely, (1) the decision should be made by the Bankruptcy Court on a case-by-case basis, *Id.* at 1508; (2) the debtor's characteristics, i.e., the nature of collateral and risk, determine the rate not the creditor's characteristic, such as

cost of money or loan costs, *Id.* at 1506; and (3) the standard of open market is adopted to determine the 'value' of the deferred cash payments, irrespective of the financial burden a debtor would have to bear in order to obtain a hypothetical new loan, the latter being irrelevant under the Code. *Id.* at 1505, 1507, N. 2."

The *Camino Real* court aptly stated that while the proper rule is unanimous among the courts, "[U]nanimity disappears upon application * * *". *Id.* at 1505.

In *In re John Martin*, 78 B.R. 598, 601 (Bankr.Mont.1987), I concluded in discussing interest rates:

"I determine in this case that the present prime rate of 8¼% on secured claims is the market rate of interest, and that an additional ¾% interest should be added to cover the risk of default. By adopting the prime rate to the market rate, I find such rate encompasses all the elements which affect the market rate of interest on a current basis in a commercial setting."

In the present case, the FLB and Beneficial each produced testimony on real estate lending rates which varied from prime plus 3 per cent and 4 per cent to 17 per cent. Beneficial's rate of 17% was based on its lending rate, considering its cost of money and profit. That approach is specifically rejected in *El Camino*, supra, because it involves "creditor characteristics", not commercial lender's rates considering the nature of security and risk. FLB expert testimony was based on telephonic survey conducted in the last few months by economic professors at Washington State University. The survey was conducted in the states of Oregon, Washington, Idaho, Montana and Minnesota, and requested of each lender (bank or insurance company) what rate of interest they were charging if a borrower with a poor credit rating, i.e., less than perfect credit history, requested a new loan from the lender for agricultural purposes. The response was not altogether surprising that the lenders were "extremely reluctant" to grant the loan, but if it did so, the loan term would not exceed 10 to 15 years, and the interest rate would be based on the existing prime rate of interest plus 3% for operating loans and prime plus 4% for long-term real estate loans. The survey question did not reveal that the debtor was a Chapter 12 debtor, no institutional lenders such as FLB or Farmers Home Administration (FMHA) were included,[3] private Contract for Deed rates were not examined or considered, and finally the lenders were not asked directly if they were in fact making agricultural loans. The latter element was stressed by the Debtors from testimony developed from their real estate broker and mortgage broker that no commercial lenders in the Bozeman area were making agricultural loans, so that no commercial lending market has been established on interest rates.

Based on the record of evidence in this case, I conclude that the commercial interest rate from banks or insurance companies is non-existent due to the lack of lending activity. That market seems to be set by private contract, between sellers and buyers of agricultural property, which is based on a rate of 8½% to 9%. I do not question that *if* a commercial banker would make an agricultural loan, the loan rate would be prime plus 3 or 4%. From FLB's expert testimony, I conclude the 3 or 4% add-on is a factor directly related to risk of default, lack of adequate security, creditor's cost of capital and requirement for profit. Since certain of these items are related to "creditor characteristics" which

3. Indeed, the expert witness correctly stated he already knew the FLB rate and FMHA's rates would not be reflective of a true commercial market for agricultural debt. Due to the unique nature of FLB, I conclude the same is true for that cooperative, which is restricted by law to making only agricultural loans. Moreover, the annual report (1985) of the Farm Credit Administration states that "[L]ending rates for each Farm Credit Bank and associations are based on the institution's financial position and operating conditions. In most cases, lending rates are adjusted regularly to reflect the actual cost of funds * * *". Debtors' Ex. 11, P. 32. The average cost of funds for the Twelfth District, which includes Montana, at the end of 1986 was 10.27%. Yet, FLB loans money to its preferred customers at 9¾% and to a high risk borrower at 12¾%.

the *El Camino* case held were irrelevant, I again return to the basic rule of *Welco,* and its progeny, that prime rate plus a risk factor should be the commercial rate in a chapter proceeding, and that the risk factor must be determined by considering the nature of security and feasibility of repayment so as to cover a risk of loss.

Accordingly, in this case, since several creditors have different and varied security interests on different collateral, each rate must be fixed for each secured creditor in accordance with the above principals based on the present record.

1. Williamson–Vadheim—This debt of $134,108.00 is secured by 40 acres of farmland at $540.00 per acre, or $21,600.00, plus 15 lots of subdivisions valued at $121,-220.00, for a total collateral of $142,820.00 Term of restructure at 15 years with interest of prime rate (9%) plus ½% for risk or 9½% would satisfy the present value test.

2. First Security Bank of Big Timber—creditor has consented to the Plan for repayment of its debt of $15,000.00 at 8½% over 30 years.

3. Tom Kamp—creditor has consented to the Plan for repayment of $2,382.00, secured by subdivision lot, to be paid in one year without interest.

4. FLB—This debt of $17,736.00 is fully secured by FLB stock ($1,800.00), farmland ($29,009.00) and contract receivable of Mallette ($15,480.00). The risk of loss is nil, so a prime rate of 9% without additional risk factor will pay present value over 30 years.

5. Montana Bank—The debt of $88,-969.89 is undersecured. Collateral consists of second lien on 116 acres of farmland valued at $29,009.00 times 68% of that value for the second lien, or $19,726.12, plus second lien on Mallette contract receivable ($15,480.00 × .68), or $10,771.20, plus irrigation equipment, miscellaneous equipment and liens valued at $17,600.00, for total collateral of $48,097.32.[4] Due to the mixed nature of the collateral, the risk of non-payment of the Mallette contract, and the 100 leveraged position, the market rate should

be prime (9%) plus 1½% or 10½%, on a loan term not to exceed 10 years on the personalty and 20 years on the realty.

6. Montana Bank—The debt of $35,-814.83 is undersecured. Collateral consists of 10 acres of farmland valued at $5,400.00. Considering the risk of loss, and 100% leveraged position, the market rate of interest should be 10½% payable over a term of 20 years.

7. Slingsby—This debt of $196,165.40 is undersecured. Collateral consists of 117 acres of farmland valued at $60,954.00 and equipment valued at $3,800.00, for a total of $64,754.00. Due to risk of default and leveraged position, the present value should be paid in deferred installments over 20 years at 10½% interest.

8. Stimpson—This debt of $45,550.26 is fully secured by collateral valued at $141,-000.00. The risk of loss is nil so that the present value of the claim should be at prime rate of 9% over 20 years.

9. Beneficial Finance—This debt of $75,890.00 is fully secured. The collateral consists of a second lien on the Stimpson Tract above described so that such collateral has value to Beneficial of $95,449.74. Since the nature of the security is real property and improvements, and the risk of loss is small, the present value of the claim should be paid at 9% over 20 years.

10. Western Federal—This creditor has consented to the Plan and its debt of $22,-140.90 shall be paid at 8½% over 30 years.

11. First National Bank—This creditor's debt of $11,777.47 is undersecured. Collateral consists of 4 automobiles valued at $1,400.00. Due to the deteriorated nature of the collateral, with the attendant risk of loss, the present value of the secured debt should be paid over 3 years at 11% interest.

12. Deutz–Allis Credit—This creditor's debt of $4,817.12 is undersecured by collateral valued at $1,685.00. Due to the condition of the collateral, and risk of loss, the present value of the claim should be paid over 2 years at 11% interest.

---

**4.** By separate order, the objection of the Debtors to the Bank's claim of perfected security interest in the 1987 crop has been sustained, and thus the Bank's claim is not secured by a crop lien.

13. Navistar—This creditor's debt of $3,850.00 is secured by collateral valued at $2,450.00. Due to the condition of the collateral and risk of loss, the present value should be paid over 2 years at 11%.

Each secured creditor will retain the lien securing their debt as provided by § 1225(a)(5) of the Code.

Since certain objections of the secured creditors have been sustained on the issues of valuations and market rate of interest, the amended Plan must be modified to incorporate these findings. Upon such amendment, the issue of feasibility will then be considered if the parties object to confirmation on that ground.

IT IS ORDERED the Debtors' Amended Chapter 12 Plan is denied confirmation, with leave of the Debtors to amend the Plan within ten (10) days of this Order.