**In re ELK CREEK SALERS, LTD., Debtor.**

No. 02–30469–JWV.

United States Bankruptcy Court,
W.D. Missouri,
Southwestern Division.

Nov. 6, 2002.

Norman E. Rouse, Collins, Webster & Rouse, Joplin, MO, for debtor.

Fred C. Moon, Springfield, MO, trustee.

Jerry L. Phillips, Office of the U.S. Trustee, Kansas City, MO, for United States Trustee.

### MEMORANDUM OPINION AND ORDER

JERRY W. VENTERS, Bankruptcy Judge.

On September 24, 2002, the Court held a hearing in Carthage, Missouri, on confirmation of the Chapter 12 Plan for Adjustment of Debts of a Family Farmer ("the Plan") filed in these Chapter 12 proceedings by the Debtor, Elk Creek Salers, Ltd. ("Debtor" or "Elk Creek"). A number of creditors filed objections to confirmation of the Plan: First National Bank of Mt. Vernon ("First National"); Union Planters Bank, N.A. ("Union Planters"); Richard M. Riddle, Personal Representative of the Estate of Stella Maye Riddle ("Riddle Estate"); Deere & Company ("Deere"); the United States of America ("United States"); and Fred Charles Moon, the Chapter 12 Trustee ("Trustee").[1]

The objections filed by the creditors raise a number of issues. For the most part, the creditors' objections will be denied, but the Debtor will be allowed some additional time in which to make certain necessary amendments to the Plan as required by this Memorandum Opinion and Order and by the Debtor's agreement with various parties.

The Plan, unfortunately, tells us very little about the Debtor's business or farming operations. However, the Court can glean from the Plan that the Debtor oper-

---

1. This Memorandum Opinion and Order constitutes the Court's findings of fact and conclusions of law pursuant to Rule 7052, Federal Rules of Bankruptcy Procedure. This Court has jurisdiction in this matter pursuant to 28 U.S.C. § § 157(a) and 1334. This is a core proceeding arising under 28 U.S.C. § 157(b)(2)(L).

ates a cow-calf business, that it owns (apparently) two farms in Lawrence County, Missouri, for the operation of the cow-calf business, and that it also owns a dry cleaners and beauty salon in Mt. Vernon, Missouri, and a steakhouse and bar in Miller, Missouri. The Debtor states that it owns four tracts of real property with a total value of $920,000.00 and miscellaneous personal property with a value of $332,480.00.[2] Against these assets with a total value of $1,252,480.00, the Debtor states that it has debts totaling $818,678.58, leaving a total of $433,801.45 of equity in its properties. The Plan proposes to pay all creditors 100 percent of their claims over time. Additional facts will be developed as necessary in the discussion of the various issues raised by the creditors.

### 1. Objections to payment provisions longer than 5 years.

Several of the secured creditors have objected to confirmation of the Plan on the basis that the Plan impermissibly provides for payments that extend beyond five years for the secured claims. These objections are without merit. The Bankruptcy Code clearly authorizes a Chapter 12 debtor to include such provisions in a plan. Section 1222(b)(9)[3] expressly states that a Chapter 12 plan may provide for the payment of allowed secured claims over a period exceeding the otherwise-applicable five-year limitation of § 1222(c) if those payments are consistent with § 1225(a)(5). One method of satisfying secured claims under § 1225(a)(5) is to provide for the secured creditor to retain the lien securing its claim and to pay the creditor to the present value of its collateral.[4]

In its very brief discussion of § 1222(b)(9), *Collier on Bankruptcy* has this to say:

> The most significant provision affecting the rights of secured claimants, however, is the authority granted [by § 1222(b)(9) ] to the debtor to pay secured claims beyond the period of time over which the debtor is making payments on unsecured claims. This authority is not limited to particular types of claims or particular types of property. *It applies not only to long-term installment obligations but to short-term obligations that have matured prior to commencement of the case. This authority is also not limited as to the length of time over which payments may be made.* The only limitation of the debtor's ability to stretch payments on secured debt will be those implied by the

11 U.S.C. § 1222(b)(9).

**2.** The Plan—we believe incorrectly—states that the value of the personal property is $232,480.00, whereas the schedules filed by the Debtor list the personal property as having a value of $332,480.00. The Court believes that the correct amount is $332,480.00.

**3.** Section 1222(b)(9) provides:

(b) Subject to subsections (a) and (c) of this section, the plan may—

\* \* \* \* \* \*

(9) provide for payment of allowed secured claims consistent with section 1225(a)(5) of this title, over a period exceeding the period permitted under section 1222(c);

**4.** Section 1225(a)(5)(B) provides:

(a) Except as provided in subsection (b), the court shall confirm a plan if—
(5) with respect to each allowed secured claim provided for by the plan—

\* \* \* \* \* \*

(B) (i) the plan provides that the holder of such claim retain the lien securing such claim; and
(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or
11 U.S.C. § 1225(a)(5)(B).

court as part of the confirmation requirements of section 1225.

8 *Collier on Bankruptcy* ¶ 1222.04, p. 1222–9–10 (emphasis added).

 Very clearly, there is no *per se* prohibition on a plan's providing for payments extending more than five years beyond confirmation; in fact, as *Collier* makes abundantly clear, the latitude to do so is one of the Code's "most significant provisions" affecting secured creditors in Chapter 12. The objecting creditors have not produced any evidence to show that the Debtor's Plan—or the specific provisions extending the term of repayment for their loans—has not been proposed in good faith, as required by 11 U.S.C. § 1225(a)(3). Accordingly, these objections will be denied.

## 2. Objections to the restructuring of fully matured notes.

 First National has objected that all six of its notes—on which the bank is admittedly oversecured—have matured and that the Debtor may not extend the repayment of those notes past the five-year period established generally for Chapter 12 plans in § 1222(c). The Court disagrees. This issue is quickly resolved by § 1222(b)(9), which specifically provides that a plan may "provide for payment of allowed secured claims consistent with section 1225(a)(5) of this title, *over a period exceeding the period permitted under section 1222(c)* . . ." § 1222(b)(9) (emphasis added). (See also the quoted statement hereinabove from *Collier.*) Section 1225(a)(5) provides, among other things, that a plan *shall* be confirmed if it provides that the secured creditors will retain the liens securing their claims and if they are paid the present value of their allowed secured claims. "The only time limits on payment of secured debt are those which are implied by the present value language

of 1225(a)(5), and the feasibility test of 1225(a)(6). Under 1225(a)(5), the rights of the nonconsenting secured creditor can be modified only if, among other things, the creditor retains its lien on the security and receives collateral with a present value not less than the amount of the secured claim." *In re Janssen Charolais Ranch, Inc.,* 73 B.R. 125, 127 (Bankr.Mont.1987); *see also In re Dunning,* 77 B.R. 789, 793 (Bankr. Mont.1987); *In re Bluridg Farms, Inc.,* 93 B.R. 648, 654 (Bankr.S.D.Iowa 1988); *In re Billman,* 93 B.R. 657, 660 (Bankr. S.D.Iowa 1988); *In re Koch,* 131 B.R. 128, 130 (Bankr.N.D.Iowa 1991). Certainly, if debtors could not extend the repayment of fully secured claims beyond five years, many Chapter 12 plans would be dead on arrival. For these reasons, First National Bank's objection to the extension of the time period for repayment of its fully matured notes beyond the five-year period established in § 1222(c) will be denied.

## 3. Objections to the interest rates proposed for secured creditors.

Union Planters and First National both object to the rate of interest proposed to be paid on their oversecured claims. Union Planters also asserts that it is entitled to be paid according to the terms of its note—both as to interest and repayment terms—because it is an oversecured creditor.

Union Planters has two claims secured by two tracts of real estate that have an agreed-upon total value of $195,000.00. The debts on the two properties total $100,050.87. The Plan proposes (Class IV) to pay the two claims on a combined basis in monthly payments over 20 years with an interest rate of 7.40 percent. First National is owed $562,606.40 on a claim that is secured by real property with a value of $449,000.00 and cattle and equipment with a value of $211,750.00 (both values are

based on the bank's appraisals). The Plan proposes (Class VI) to pay the real estate claim in the amount of $449,000.00 in semi-annual payments over 20 years, with an interest rate of 7.40 percent, the same rate proposed for the real estate loan of Union Planters. The Plan proposes to pay the balance ($113,606.40) of First National's claim, which is secured by the cattle and equipment, in semi-annual installments over seven (7) years with an interest rate of 6.22 percent. In both instances, the Debtor based the interest rate on the Treasury bond rate for similar time periods (either 20 years or seven years, as appropriate), plus a 2 per cent risk factor, relying on *United States v. Doud (In re Doud)*, 869 F.2d 1144 (8th Cir.1989).[5]

■ As this Court has previously observed in *In re Lockard*, 234 B.R. 484, 494 (Bankr.W.D.Mo.1999), it is clear in the Eighth Circuit that the appropriate rate of interest to be paid on a secured creditor's claim in Chapter 12 is the prevailing market rate, which must be determined on a case-by-case basis, following *Doud* and *In re Fisher*, 930 F.2d 1361 (8th Cir.1991). In *Doud*, the Court of Appeals affirmed the District Court's finding that an appropriate market rate of interest for a secured claim in Chapter 12 was the yield on United States Treasury bonds for the comparable repayment period (this being termed the "risk-free" or "riskless" rate) plus an additional 2 percent to account for the risks inherent in the loan, as affected by the Debtor's plan. As this Court stated in *Lockard*, applying the *Doud* formula should, in most cases, result in a fair rate of return for the secured creditor, although it probably will not, as a general

rule, give the secured creditor the full interest rate for which it had originally bargained. At that time, the Court expressed the hope that applying the *Doud* formula would provide a degree of uniformity and predictability on which both creditors and debtors could rely as they negotiated the terms of reorganization plans. *Lockard*, 234 B.R. at 495.

Unfortunately, applying the *Doud* formula in this case did not satisfy Union Planters and First National. Both creditors argue that they should receive their contractual rates of interest (which, interestingly, are not set out in their objections) and be paid on their contractual terms.

■ This Court sees no reason to depart from the *Doud* formula or to abandon its previous holding in *Lockard*. And, in the instant case, the interest rates arrived at by applying the *Doud* formula appear to be appropriate under the circumstances. Union Planters is to receive a risk-free interest rate of 7.40 percent on two loans that are secured by real estate with a value almost twice that of the debts owed. That is certainly an appropriate rate of interest considering Union Planters' strongly collateralized position. As for First National, the Debtor has, for Plan purposes, allocated its total debt between the real estate collateral, on the one hand, and the cattle and equipment security, on the other hand, but the bank's claims are cross-collateralized. The Debtor notes that the total amount of indebtedness to First National is $562,606.40 and the value of its collateral is $660,750.00, affording the bank an equity cushion of almost

---

**5.** In the Plan, the Debtor states that the proposed interest rates are based on the Treasury bond rates in effect on July 12, 2002, when the Plan was apparently being prepared. At the confirmation hearing on September 26, 2002, the Debtor offered into evidence the Treasury bond rates that were in effect on September 23, 2002, just three days earlier. The Court would note that the rates on September 23 were even lower than the rates utilized by the Debtor in the Plan.

$100,000.00. Under these circumstances, First National has an ample equity cushion with very little risk, and therefore the *Doud* formula was properly applied by the Debtor in providing for payment of the debts owed to First National.[6]

Counsel for First National argued that the bank was entitled to its contractual rate of interest on the authority of the Eighth Circuit's decision in *Prudential Insurance Company of America v. Monnier Brothers (In re Monnier Brothers)*, 755 F.2d 1336 (8th Cir.1985). *Monnier Brothers* was a Chapter 11 case, so it is not directly on point with this case, but more importantly, the Court in that case did not *require* that the creditor be paid its contract rate of interest. Rather, the Court found that the contract rate of interest was appropriate under the circumstances in that case. The Court extended a broad grant of discretion to the bankruptcy courts in determining the appropriate interest rate when it quoted the following passage from *Collier on Bankruptcy:*

> The appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount rate, the court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration for the quality of the security and the risk of subsequent default.

*Monnier Brothers*, 755 F.2d at 1339, quoting 5 *Collier on Bankruptcy* ¶ 1129.03, at 1129–65.

In the instant case, First National (and Union Planters) have substantial and ade-quate security for their loans and very little, if any, risk of loss even upon default by the Debtor. The Debtor has determined the interest rate by relying on the prevailing Treasury bond rate for terms equal to the payout periods. The creditors have not adduced any evidence of other prevailing interest rates for loans of these types; in fact, they did not even put into evidence their contractual interest rates or repayment terms. Thus, the interest rates proposed in the Plan for the debts owed to Union Planters and First National are appropriate, and the banks' objections will be overruled.

Finally, counsel for Union Planters has not directed the Court to any authority *requiring* that an oversecured creditor must be paid on its contractual terms, as Union Planters insists is the law. The Court is unaware of any such authority. This argument seems to be in direct conflict with the provisions of §§ 1222(b)(9) and 1225(a)(5)(B), discussed hereinabove. Moreover, the argument is not supported by this Court's reading of the Eighth Circuit's *Doud* and *Monnier Brothers* cases, as discussed above. *See also U.S. v. Arnold (In re Arnold)*, 878 F.2d 925, 929–30 (6th Cir.1989)(the appropriate interest rate to ensure payment of the present value of the creditor's secured claim is the current market rate, not the contract rate); 8 *Collier on Bankruptcy* ¶ 1325.06[3][b][iii][B], at 1325–36 (15th ed. rev.1999)(noting that during the legislative process leading to the Bankruptcy Amendments and Federal Judgeship Act of 1984, Congress specifically considered and rejected an amendment requiring payment of a contract rate of interest under § 1325(a)(5)(B)(ii)). Ac-

---

**6.** It should also be noted that First National asserts that it has a lien on the property that the Debtor is purchasing from the Riddle Estate. That farm property has a value, according to the Debtor, of $250,000.00, and the Riddle Estate is owed just $114,811.77.

Therefore, if the bank does, indeed, have a valid lien on that property, its collateral position would be enhanced by more than $130,000.00, thereby lending even further support to the propriety of the interest rates proposed by the Debtor.

cordingly, this objection will likewise be denied.

■ However, the Court would observe that the banks are entitled, as oversecured creditors, to receive their contract rates of interest through the date of confirmation, pursuant to the provisions of 11 U.S.C. § 506(b); thereafter, they should be paid the rates set out in the confirmed Plan. *Rake v. Wade*, 508 U.S. 464, 468, 113 S.Ct. 2187, 2190, 124 L.Ed.2d 424 (1993); *In re Wilmsmeyer*, 171 B.R. 61, 63 (Bankr. E.D.Mo.1994). Presumably, the parties will be able to arrive at the correct amounts without the intervention of the Court.

### 4. Objections that the Plan improperly discriminates between classes of secured creditors.

Deere and First National complain that the Plan improperly and unfairly discriminates between and among the secured creditors, who have been placed in different classes by the Debtor.

In Class III, the Debtor proposes to pay Deere $15,598.34 over a period of seven years at an interest rate of 6.22 percent. The claim is secured by a 1999 4250 John Deere tractor with a value of $25,000.00 (Debtor) or $22,500.00 (creditor); whichever value is used, the claim is fully secured. In Class VI, the Debtor proposes to pay First National $113,606.40 on that part of its claim that is secured by the Debtor's cattle and equipment, which are valued at $211,750.00 (bank's appraisal). This claim is, like the Deere claim, to be paid over seven years at an interest rate of 6.22 percent. In Class VII, the Debtor proposes to pay the fully secured claim of Union Planters over a period of less than five years, with interest of 6.22 percent, in monthly payments of $673.68. Union Planters' claim is $33,126.00 and is secured by a truck and trailer with a combined value of $48,000.00. (At the confirmation hearing, Union Planters withdrew its objection to this provision of the Plan.)

With respect to the claims that are secured by real estate, the Debtor has proposed to pay those fully secured claims over 20 years with an interest rate of 7.40 percent (Class IV—Union Planters; Class V—Riddle Estate; Class VI—First National Bank).

■ Section 1222(a)(3) of the Code requires that, if a plan classifies claims and interests, it shall "provide the same treatment for each claim or interest within a particular class unless the holder of a particular claim or interest agrees to less favorable treatment."[7] With specific reference to unsecured claims, § 1222(b)(1) states that a Chapter 12 plan may designate a class or classes of unsecured claims, "but may not discriminate unfairly against any class so designated..."[8] These provisions have been construed to prohibit unfair discrimination between all classes in a plan. "The Code does not prohibit unequal treatment of claims that are properly classified in different classes *so long as*

---

7. Section 1222(a)(3) provides:

 (a) The plan shall—
 (3) if the plan classifies claims and interests, provide the same treatment for each claim or interest within a particular class unless the holder of a particular claim or interest agrees to less favorable treatment.
 11 U.S.C. § 1222(a)(3).

8. Section 1222(b)(1) provides, in pertinent part:

 (b) Subject to subsections (a) and (c) of this section, the plan may—
 (1) designate a class or classes of unsecured claims, as provided in section 1122 of this title, but may not discriminate unfairly against any class so designated;
 11 U.S.C. § 1222(b)(1).

*the discrimination is not unfair."* In re *Harper,* 157 B.R. 858, 864 (Bankr.E.D.Ark. 1993), citing 5 Lawrence A. King, et al., *Collier on Bankruptcy* ¶ 1222.03 (15th ed.1989) (emphasis added). Thus, the Code does not prohibit discrimination between classes of creditors and their treatment, but it does prohibit *unfair* discrimination.

■ A full reading of the Debtor's Plan does not reveal any unfair discrimination. In fact, the only actual discriminatory treatment among the secured creditors is the provision for the payment of the Union Planters claim (Class VII) that is secured by the truck and trailer. In that instance, the Debtor predicts that the debt will be paid off in less than five years, as against a seven-year payout for the other claims (Deere and First National) that are secured by personal property. First of all, the discrimination between these provisions is minimal (five years versus seven years) and should not be cause for great concern. Secondly, the Debtor has extended the life of the loan at Union Planters by several months (from a 36–month payout to a 60–month payout), which is similar to the extensions that are made on the other claims secured by personal property. Finally, the Union Planters loan is secured by a 1992 International road tractor, which is an older piece of equipment subject to more rapid depreciation than the collateral securing the other loans. For these reasons, the Court finds that the discriminatory treatment that is accorded the Union Planters claim is not unfair, but rather is justified under the circumstances.

As for the real estate loans, there is no discrimination among them, actual or unfair. All of those loans are to be paid over 20 years at 7.40 percent interest. In all instances—both for the real estate loans and the personal property loans—the Debtor has based the interest rate on the *Doud* formula, which the Court has expressly approved. At the hearing, counsel for Union Planters said that the bank did not object to a 20–year amortization but would prefer that the Plan provide for 10 years of payments and then a balloon of the balance. Granted, such a provision might be preferable for the bank, but granting that request would unfairly discriminate in favor of Union Planters. A 20–year amortization and payout is fair for all of the real estate creditors.

Therefore, the objections based on allegedly unfair discrimination between the classes will be denied.

5. **Objections as to feasibility, commitment of disposable income, and retention of liens.**

Several of the creditors have objected that the Plan is not feasible and therefore cannot be confirmed, because the Debtor would not be able to make all payments under the Plan, as required by 11 U.S.C. § 1225(a)(6). Alternatively, some of the creditors contend that the Plan does not contain sufficient information to enable them to determine whether the Plan is feasible or not. The creditors also complain that it is unclear whether the Debtor has committed all of its disposable income to performance of the Plan over the next three years, as required by 11 U.S.C. § 1222(a)(1). Finally, the creditors assert that the Plan does not provide that the secured creditors will retain their liens until they are paid in full, as required by 11 U.S.C. § 1225(a)(5)(B)(i).

■ Before it can confirm a Chapter 12 plan, the Court must find, among other things, that "the debtor will be able to make all payments under the plan and to comply with the plan." 11 U.S.C.

§ 1225(a)(6).[9] In other words, the Court must find that the plan is feasible. "The feasibility test requires the court to analyze the debtor's proposed plan payments in light of the debtor's projected income and expenses and to determine that the debtor is likely to be able to make all payments required by the plan." 8 *Collier on Bankruptcy* ¶ 1225.02[5], p. 1225-10 (15th ed. rev.1999). The plan must establish a reasonable probability of success. *Lockard*, 234 B.R. at 492. "The test is wether the things which are to be done after confirmation can be done as a practical matter under the facts." *Clarkson v. Cooke Sales and Service Co. (In re Clarkson)*, 767 F.2d 417, 420 (8th Cir.1985).

■ The Debtor states that it has assets with a value of $1,252,480.00 and total liabilities of $818,678.58, and therefore it has proposed a 100 percent payment plan. The Plan does not set out the amount of the Debtor's unsecured debt, but the schedules filed earlier in the case reflect general unsecured debts of just $14,204.31.

In Article VIII of the Plan, the Debtor sets out its grounds for finding that the Plan is feasible. The Debtor states that its average annual gross income for the last three years has been $231,454.00 and that its net operating expenses have been $81,929.00 annually, resulting in a net profit of $149,525.00 on an annual average. However, in the last paragraph of Article VIII, the Debtor projects that it should have $118,727.00 of income available in each of the next three years to make the required Plan payments. No explanation is given for this apparent decrease in net income from $149,525.00 a year to $118,727.00. One could surmise that the decrease would come about because, in Article IX, the Debtor indicates that it intends to sell what it calls the "South Farm," the property on which First National has a deed of trust, and if that farm is sold the Debtor will "significantly reduce" its cow-calf operations. In fact, it states that, when the South Farm is sold, the Debtor will sell approximately one-half of its cattle operation and pay the proceeds to the bank. If a significant amount of the real estate is sold and the cattle operation is reduced by half, then it certainly seems reasonable to anticipate that revenues would be significantly reduced.

In any event, whether the annual income is $149,525.00 or $118,727.00, the Debtor projects Plan payments of only about $105,000.00 in the first year and less than $103,000.00 in the second and third years, at which time the rather minimal unsecured debt would be paid in full. And, if the South Farm is sold and the cattle operations are reduced by half, as the Debtor anticipates, the amounts required for debt service under the Plan should be substantially reduced, perhaps by as much as one-half.

■ Therefore, on its face, the Plan is feasible. That is, the projected income would exceed the projected Plan payments by approximately $15,000.00 a year, or almost 15 percent. The objecting creditors have offered no evidence to demonstrate why they think the Plan is not feasible, and the burden is on them to come forward with at least a modicum of evidence if they truly believe the Plan will not work. As it presently stands, the Court can only guess at the reasons the creditors consider the Plan to not be feasible. However, the Court would encourage the Debtor, in fil-

**9.** Section 1225(a)(6) provides:

(a) Except as provided in subsection (b), the court shall confirm a plan if—

(6) the debtor will be able to make all payments under the plan and to comply with the plan.

11 U.S.C. § 1225(a)(6).

ing its amended Plan, to provide more explanation with respect to feasibility, particularly addressing the questions raised by the Court hereinabove.

With respect to the devotion of the Debtor's disposable income to the Plan, § 1222(a)(1) requires that a plan "provide for the submission of all or such portion of future earnings or other future income of the debtor to the supervision and control of the trustee as is necessary for the execution of the plan."[10] Paragraph 9 of Article XV of the Plan practically mimics the language of the statute: "The debtor shall submit such portion of its future income or earnings to the supervision and control of the trustee as shall be necessary for the execution of the Plan." It is hard to imagine how the Plan could be any clearer.

As for the retention of liens, § 1225(a)(5)(B)(i) requires that, with respect to each secured claim provided for by the Plan, the Plan must provide that the holder of the secured claim shall retain the lien securing the claim. Article XI of the Debtor's Plan is entitled, in bold letters, "Retention of Liens and Incorporation of Documents." The first sentence states: "All creditors whose claims are treated as secured in this plan shall retain their liens on the collateral securing their respective claims until such claims are paid in full in the amount allowed as secured and except as otherwise provided under this plan." Once again, it is hard to imagine how the Plan could be any clearer.

The objections as to feasibility, the commitment of disposable income to the Plan, and the provisions for retention of liens are denied.

### 6. The objections of the Riddle Estate.

The Riddle Estate objects to confirmation of the Debtor's Plan on grounds that the Plan violates the provisions of a state court judgment and is, in effect, an impermissible "appeal" of the state court judgment in violation of the *Rooker–Feldman* doctrine.

On June 5, 2000, the Lawrence County Circuit Court entered a judgment determining that Elk Creek had validly exercised its contractual option to purchase a 237–acre farm that was property of the probate estate of decedent Stella Maye Riddle, and finding that Richard Riddle, the Personal Representative of the Stella Maye Riddle Estate, had wrongfully refused to perform his part of the option agreement. Accordingly, the Circuit Court ordered Richard Riddle to deliver a deed to the property to Elk Creek, and in turn ordered Elk Creek to make a payment of $10,000.00 and execute a note and deed of trust for the balance of the contractual purchase price. Richard Riddle appealed to the Missouri Court of Appeals, contending in his sole point on appeal that the Circuit Court had improperly allowed Elk Creek a $20,000.00 credit on the purchase price. The Court of Appeals agreed, and on remand the Circuit Court entered an amended judgment finding that the total purchase price under the option should be $116,758.00.

Subsequent to the entry of the amended judgment, and in compliance with the original judgment, Elk Creek on March 1, 2001, executed a promissory note in favor of the Riddle Estate in the amount of $106,758.00, having paid the $10,000.00 down payment. The note provided for

**10.** Section 1222(a)(1)
 (a) The plan shall—
 (1) provide for the submission of all or such portion of future earnings or other future income of the debtor to the supervision and control of the trustee as is necessary for the execution of the plan;
11 U.S.C. § 1222(a)(1).

annual payments of $4,000.00 each, commencing June 30, 2002, and continuing through June 30, 2010. The remaining balance of the note would balloon and be due and payable, with interest, on March 1, 2011. The note provided for interest of six (6) percent a year. On January 31, 2002, Elk Creek executed a deed of trust to secure the note; the reason for the delay in executing the deed of trust has not been explained but is not critical in any event to these proceedings. The deed of trust has been recorded.

The Debtor failed to make the June 30, 2002, annual payment, and the Riddle Estate filed a proof of claim in these Chapter 12 proceedings in the amount of $114,811.77. The Debtor does not contest that amount, and proposes in the Plan to pay that amount over 20 years, with interest at the rate of 7.40 percent per annum (1.40 percent more than provided in the promissory note), in semi-annual payments of $5,444.31, with the first payment due six months after confirmation. Therefore, the Plan proposes to pay the full amount of the debt, with an increased interest rate, but over 20 years instead of the 10 years provided in the promissory note. There is no dispute that the real property securing the note has a value well in excess of the amount owed, and that the Riddle Estate is, therefore, oversecured.

The Riddle Estate asserts that the Plan seeks to modify the final judgment of the Circuit Court and in doing so violates the *Rooker-Feldman* doctrine. The Debtor responds that the Plan does not modify the state court judgment because the parties have performed the terms of the judgment by exchanging the warranty deed and the required promissory note and deed of trust. Additionally, the Debtor asserts that the parties have themselves already modified the judgment by entering into a new note that compromised the amount of interest owed by the Debtor. For these reasons, the Debtor asserts that the *Rooker-Feldman* doctrine has no application. The Court agrees with the Debtor.

[13] The *Rooker-Feldman* doctrine is named for two United States Supreme Court cases which dealt with the authority of lower federal courts to review state court decisions: *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983) (holding that lower federal courts possess no power whatsoever to sit in direct review of state court decisions), and *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923) (holding that no court of the United States, other than the Supreme Court, could entertain a proceeding to reverse or modify the judgment of a state court). See *Miller & Miller Auctioneers, Incorporated v. Ritchie Brothers Auctioneers International, L.P. (In re Missouri Properties, Ltd.),* 211 B.R. 914, 928 (Bankr.W.D.Mo.1996). The Eighth Circuit Court of Appeals has made it clear that the *Rooker-Feldman* doctrine "forecloses not only straightforward appeals but also more indirect attempts by federal plaintiffs to undermine state court decisions." *Lemonds v. St. Louis County,* 222 F.3d 488, 492 (8th Cir.2000); *see Car Color & Supply, Inc. v. Raffel (In re Raffel),* 283 B.R. 746, 748–49 (8th Cir. BAP 2002).

■ The *Rooker-Feldman* doctrine does not apply in this case for the simple reason that the Debtor's Plan in no way seeks to have this Court review or modify the state court judgment. The Debtor and the Riddle Estate have already performed the terms of the state court judgment by executing and delivering to each other the deed, the promissory note, and the deed of trust as required by the Circuit Court. Counsel for the Riddle Estate admitted in argument that the note and deed of trust were in compliance with the judgment.

There is nothing left for the parties to do under the state court judgment. The Debtor's Plan does not challenge or seek to modify the state court judgment; it seeks to modify the promissory note executed by the Debtor in compliance with the state court judgment. Such a modification is clearly permissible under § 1225(a)(5)(B) of the Code.[11] Therefore, the Riddle Estate's objection to the Plan on the basis of the *Rooker–Feldman* doctrine will be denied.

### 7. First National's claim of a lien on the Riddle Estate property.

Though not mentioned in its written objections to confirmation of the Plan, First National has asserted that it has a security interest in what the Debtor calls the "North Farm," a farm near LaRussell, Missouri, that has a purported value of $250,000.00. The Debtor acknowledges the bank's assertion of this claim in its Plan, but makes no provision for any payments with respect to the claim. According to the Plan, the bank claims a security interest in the North Farm on the basis of an assignment of the Debtor's lease with option to purchase the farm. The Debtor acknowledges that, at the time the assignment was made, the Debtor did have an unexercised option to purchase the North Farm, and that after the assignment was made the Debtor exercised the option and purchased the property and gave the Riddle Estate a note and a deed of trust on the property (see section 6 hereinabove). The Debtor and the bank seemed in agreement at the confirmation hearing that the

bank has not recorded a deed of trust on the property, although the bank's counsel stated that the assignment of the lease was recorded. The bank claims that it has at least an equitable lien on the North Farm, and that its lien cannot be taken away by the Plan.

In fact, the Plan makes no provision whatever with respect to First National's claimed lien. It simply states that the bank has made such a claim. Since the Plan proposes to pay the Debtor's debt to First National in full, and since it appears that First National is fully secured by other collateral, the Plan's feasibility and payment provisions should not be affected one way or the other should it be determined that First National has a valid lien on the North Farm. The Court agrees that any purported lien cannot be taken away by the Plan, and that an adversary proceeding will be required for the resolution of this dispute, should First National desire to pursue this matter. As it stands, the Plan is not objectionable in this regard. If it is later determined that First National has a valid lien on the North Farm, the Debtor could then amend or modify its Plan.

### 8. Other objections of Deere.

In addition to the objections already dealt with hereinabove, Deere objects that the extension of the payment period on its secured claim in effect destroys Deere's security interest in the Debtor's 1999 John Deere tractor because of the depreciation in value of the tractor. Under the original note, the debt secured

---

**11.** Richard Riddle's objections to the Plan seem to be rooted more in the past contentious history of the parties than in a good faith belief that the *Rooker–Feldman* doctrine applies. A dissenting opinion filed by the Court of Appeals suggests that Richard Riddle did not like the deal his mother had made with Elk Creek, and it appears that he has

done all he can to undo or derail it. The Court's suspicions are understandably aroused when a creditor objects to a Plan that would increase the interest rate on the creditor's promissory note by almost 25 percent, even though the payout term is substantially extended.

by the tractor was to be paid in full by July 10, 2004. However, under the Plan, the unpaid balance is to be paid over seven years, and thus will not be fully paid off until perhaps early in 2010. The Court does not find Deere's argument persuasive. Granted, the extension of the loan payout by five years or more is significant, but Deere is owed just $15,598.34 on a tractor that is valued at $22,500.00 to $25,000.00. Therefore, Deere has ample equity to protect its interests. Moreover, it appears that the Debtor is engaged in a cattle operation, so it seems likely that the tractor will not be used as extensively as it might be if the Debtor were engaged in a row crop operation, and the depreciation in value will therefore be less. Therefore, this objection will be denied.

■ Deere also complains that the Plan does not contain an affirmative statement that the Debtor will maintain insurance on the tractor during the life of the Plan. The creditor is correct in this regard. Counsel for the Debtor stated in open Court that the Debtor does have the tractor insured and will keep it insured to its full value throughout the life of the Plan. However, in amending the Plan, the Debtor should state its intentions with respect to the insurance coverage as to all of the secured creditors, not just Deere.

### 9. Other objections of First National.

■ First National lodged an objection that the Plan is vague and indefinite with respect to the provisions for the sale of the property known as the South Farm, which is collateral for First National's secured loan. The Debtor states in Article IX of the Plan that it has listed the South Farm for sale for a price of $475,000.00 and discloses that the property is listed with Carol Jones Realty Company. The Debtor states that it is endeavoring to sell the farm as a whole, but may consider dividing

it and selling it in tracts, if an agreement can be reached with the bank. If an agreement cannot be reached for sale of the tract in parcels, the Debtor states that it may seek Court approval for such sales.

The Court does not find these provisions impermissibly vague or indefinite. The listing price for the South Farm is disclosed in the Plan, and it is greater than the amount of debt ($449,000.00) that the Debtor has allocated to the real estate. The name of the realtor is disclosed; if the bank wants more information about the realtor, it should be able to obtain that information with a single telephone call to Debtor's counsel. The only things that are indefinite about the proposed sale of the real estate in the Plan are when the real estate might be sold and how it might be sold, neither of which it would be reasonable to expect the Debtor to predict with any degree of precision. Since First National is being paid its secured debt through the Plan, when (or if) the real estate is sold should not be a huge concern, certainly not any more of a concern in this bankruptcy case than in a nonbankruptcy situation. If the bank was not receiving periodic mortgage payments under the Plan, then its concerns would certainly be justified, but that is not the case. As a practical matter, the Debtor should keep the bank informed of its efforts to sell the South Farm, but amending the Plan is not necessary.

First National's objection on this point will be overruled.

■ Finally, First National argues that the discharge provision in the Plan is inconsistent with the Bankruptcy Code and could be interpreted as granting the Debtor a discharge prior to completion of the payments required by the Plan. Article XVIII of the Plan, entitled "Discharge," states in full as follows:

Upon the debtor's compliance with the provisions of the plan for the term of the plan, the court shall enter a discharge which discharges the debtor from all claims provided for in the plan except as provided in 11 U.S.C. Section 1222(b)(5) and (9) and 11 U.S.C. Section 523(a).

The Court does not believe that this language—although it could perhaps be clearer—runs afoul of 11 U.S.C. § 1228.[12] The Plan language states that the Debtor will not receive a discharge until it has complied with the provisions of the Plan "for the term of the plan...." It then excepts from discharge those secured debts that are to be repaid as permitted by §§ 1222(b)(5) or 1222(b)(9), just as the statute does. Accordingly, this objection will be overruled.

### 10. The objections of the United States.

The United States has objected that the Plan does not adequately treat its secured claim in the amount of $5,450.77, which it alleged is secured by virtue of a Notice of Federal Tax Lien filed in Newton County, Missouri, on October 16, 1997. The Debtor responds that the Internal Revenue Service's ("IRS") claim is an unsecured priority claim because the Notice of Federal Tax Lien was filed in the wrong county; all of the Debtor's property is located in Lawrence County, not Newton County. At the hearing, counsel for the United States seemed to agree with the Debtor. Nevertheless, in the Plan the Debtor states that it disputes the IRS's claim and will not pay the claim unless it is approved

by the Court. The Debtor should amend the Plan to now clarify that the claim will be paid as an unsecured priority debt, if that is in fact what the Debtor has agreed to do.

### 11. The objections of the Chapter 12 Trustee.

The Chapter 12 Trustee, Fred Charles Moon, filed several objections to the Plan. However, counsel for the Debtor announced at the confirmation hearing that all of these objections had been resolved, but that it would be necessary for the Debtor to amend the Plan with respect to provisions for the payment of the Trustee's attorney's fees. Therefore, the Trustee's objections will be overruled, on the understanding that the Debtor will amend the Plan to resolve the remaining differences.

For all of the reasons set out hereinabove, it is, therefore,

**ORDERED** that the objections to confirmation filed herein by First National Bank of Mt. Vernon; Union Planters Bank, N.A.; Richard M. Riddle, Personal Representative of the Estate of Stella Maye Riddle; Deere & Company; the United States of America; and Fred Charles Moon, the Chapter 12 Trustee, be and are hereby DENIED except as set out hereinabove. It is

**FURTHER ORDERED** that the Debtor, Elk Creek Salers, Ltd., be and is hereby granted until December 2, 2002, to file an Amended Plan or amendments to the original Plan that incorporate the changes and amendments required by this Memo-

**12.** Subsection (a) of § 1228 provides:

(a) As soon as practicable after completion by the debtor of all payments under the plan, other than payments to holders of allowed claims provided for under section 1222(b)(5) or 1222(b)(9) of this title, unless the court approves a written waiver of discharge executed by the debtor after the order for relief under this chapter, the court shall grant the debtor a discharge of all debts provided for by the plan allowed under section 503 of this title or disallowed under section 502 of this title, except any debt—

11 U.S.C. § 1228(a).

randum Opinion and Order and by the agreements entered into by the Debtor with various of the creditors. It is

**FURTHER ORDERED** that a final hearing on confirmation shall be scheduled by the Court on December 19, 2002. Any objections to the Debtor's Amended Plan or amendments to the original Plan, as the case may be, shall be filed on or before December 12, 2002.