**In re Danny Ray YETT and Frances Ann Yett, Debtors.**

**Wells Fargo Bank Northwest, N.A., Appellant,**

**v.**

**Danny Ray Yett; Frances Ann Yett, Appellees.**

**BAP No. ID–03–1250–BKMu.**
**Bankruptcy No. 02–03054.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted Nov. 20, 2003.

Filed Jan. 27, 2004.

10. The Court has nothing to do with what is not before it.

Trevor L. Hart, Perry Law, P.C., Boise, ID, for Wells Fargo Bank Northwest, N.A.

Joseph M. Meier, Cosho, Humprey, Greener & Welsh, P.A., Boise, ID, for Danny and Frances Yett.

Before BRANDT, KLEIN and MUND,[1] Bankruptcy Judges.

## OPINION

BRANDT, Bankruptcy Judge.

Can chapter 12[2] debtors confirm a "cramdown" plan over the objection of the holder of two secured promissory notes which had matured prepetition, although the plan neither cures the defaults nor pays interest at the default rate? The creditor objected but did not proffer evidence. The bankruptcy court confirmed the plan. This timely appeal followed.

## I. FACTS

Debtors Danny and Frances Yett operate a family dairy farm in Idaho. They filed a chapter 12 petition on 18 September 2002. Wells Fargo Bank Northwest, N.A., is the holder of a $439,244.01 secured claim, evidenced by two promissory notes, in the amounts of $175,000 and $426,000. Both matured approximately four months prepetition.

The notes were fully secured by debtors' inventory, accounts receivable, farm equipment, and products, livestock, milk and milk proceeds, which the bank valued at $500,000. Both notes require interest at the same variable rate, initially 8.5%, calculated at the bank's "prime rate" plus 1.5% per annum. Debtors did not pay the debt to Wells Fargo by the maturity date.

Each note contains the following "Lender's Rights": "Upon default, including fail-

ure to pay upon final maturity, Lender, at its option, may also ... increase the variable interest rate on this Note to 5.500 percentage points over [the prime rate]." When the notes were not paid at maturity, the bank exercised those rights. Its proof of claim in the bankruptcy reflected an interest rate of 10.25% as of the petition date, which had decreased to 9.75% when the claim was filed.

Debtors filed a plan of reorganization, proposing to consolidate the bank's two loans and repay them over seven to eight years with income from milk production. As ultimately confirmed, the plan provided that the bank would retain its security and be repaid on an eight-year schedule, funded by the herd's milk production. At the confirmation hearing, the plan was modified to provide interest on the bank debt at the non-default contract rate of 1.5% over the bank's "prime rate."

While the plan does not explicitly set forth the amount of the bank's allowed secured claim, debtors' counsel represented at argument that the allowed claim amount includes interest at the default rate through confirmation, the plan's effective date. In any event, although the bank suggested otherwise at argument, it did not raise an issue regarding pre-confirmation interest in its brief, and has waived it. *Law Offices of Neil Vincent Wake v. Sedona Inst. (In re Sedona Inst.)*, 220 B.R. 74, 76 (9th Cir. BAP 1998).

Wells Fargo objected to confirmation on the theory that § 1225 requires cure of the default by payment of either the claim in full as of the plan's effective date or post-confirmation interest at the contractual de-

---

1. Hon. Geraldine Mund, Bankruptcy Judge for the Central District of California, sitting by designation.

2. Absent contrary indication, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330, and all rule references are to the Federal Rules of Bankruptcy Procedure.

fault rate of the original notes. It proffered no evidence.

The bankruptcy court overruled the objection and confirmed the plan following the confirmation hearing, explaining its reasoning in a written decision:

WFB also objects to the interest rate provided under Class 8 of the Plan. As noted above, Debtors propose to pay the obligation to WFB using the variable rate formula found in the underlying notes (which they characterize as the "contract rate"). Debtors believe this provides the "present value" required under § 1225(a)(5)(B)(ii). In order to provide present value, a plan must include a "market rate" of interest for loans of similar quality, nature and risk..... *WFB did not contend that this rate was not an appropriate market rate nor did it introduce evidence on the point.*

WFB instead argues that, because the notes had maturity dates of May 5, 2002, the obligations were in default prior to Debtors' September 18, 2002 bankruptcy filing.... in order to appropriately cure the defaults, Debtors must either pay the obligations in full on the effective date of the plan or provide the "default rate of interest" as the interest rate for purposes of § 1225(a)(5)(B)(ii).

WFB has provided no direct authority in support of this contention. Further, its position is contradicted by several other cases, none of which WFB addressed.

Memorandum of Decision, at 10–11 (emphasis added, citations omitted).

The confirmation order was entered 18 April 2003, and the bank timely appealed.

## II. JURISDICTION

The bankruptcy court had jurisdiction via 28 U.S.C. § 1334, § 157(b)(1) and (2)(L), and we do under 28 U.S.C. § 158(c).

## III. ISSUE

Is a Chapter 12 plan which neither provides for immediate repayment of matured notes owing to a secured claimant nor for interest at the default rate confirmable under § 1225(a)(5)(B)(ii)?

## IV. STANDARD OF REVIEW

■ A. Confirmation of a chapter 12 plan requires analysis and interpretation of the Bankruptcy Code; we review issues of statutory construction and conclusions of law, including interpretation of the Bankruptcy Code and Rules, de novo. *Predovich v. Staffer (In re Staffer)*, 262 B.R. 80, 82 (9th Cir. BAP 2001), *aff'd*, 306 F.3d 967 (9th Cir.2002).

■ B. The determination of factors to apply in a valuation calculation pursuant to § 1225 involves an interpretation of statute that we review de novo, while the application of those factors to a particular case is a question of fact reviewed for clear error, giving "substantial deference" to the bankruptcy court in making cramdown interest rate determinations. *Farm Credit Bank v. Fowler (In re Fowler)*, 903 F.2d 694, 696 (9th Cir.1990), *citing with approval, Patterson v. Federal Land Bank (In re Patterson)*, 86 B.R. 226, 227 (9th Cir. BAP 1988). We review factual findings for clear error. Rule 8013. A factual finding is clearly erroneous if the appellate court, after reviewing the record, has a firm and definite conviction that a mistake has been committed. *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

## V. DISCUSSION

### A. *Cramdown:*

"Cramdown" and "cram down" are bankruptcy terms of art which do not ap-

pear in the Bankruptcy Code: they refer to the modification of the rights of a secured creditor over its objection. As noted by a leading scholar:

> In many cases filed under Chapter 13 of the Bankruptcy Code, the debtor wants to keep her car or truck and modify the terms of her car note in a manner that is not acceptable to the lender. And, in many Chapter 11 business cases, the debtor wants to keep its equipment or building and modify the terms of its secured loan in a manner that is not acceptable to the lender. A bankruptcy court can confirm a Chapter 11, 12, or 13 plan that modifies the rights of a secured creditor without the consent of that creditor. In other words, the plan can be "crammed down" over the objection of the secured creditor.
>
> . . . .
>
> [T]here are two separate valuations involved in the cram down of a secured claim. First, the court must determine the value of the creditor's collateral. Second, the court must determine the value of the deferred payments proposed by the plan to determine whether the present value of such payments at least equals the value of the collateral.
>
> . . . .
>
> The cram down of a secured claim involves not only section 506 [providing that creditor's secured claim is limited to the value of the collateral], but also section 1129(b)(1), section 1222(b)(2), or section 1322(b)(2), which permit a Chapter 11, 12, or 13 plan to "impair" or "modify" the rights of holders of secured claims. Any plan impairment or modification must be confirmed by the bankruptcy judge. In approving such a change over the objection of the affected secured creditor, the court must find that the requirements of sections 1129(b)(2)(A), 1225(a)(5)(B)(ii), or 1325(a)(5)(B)(ii), generally referred to as the cram down provisions, have been satisfied.
>
> . . . .
>
> [T]he courts and commentators have generally treated the question of how the cram down interest rate should be determined as a question that is answered the same in Chapter 11, 12, and 13 cases. Note the italicized phrase, "value, as of the effective date of the plan," in each of these sections. Each of these provisions requires that a secured creditor who is not either paid in full or permitted to repossess must receive the present equivalent value of its secured claim.

David G. Epstein, *Don't Go and Do Something Rash about Cram Down Interest Rates*, 49 Ala. L.Rev. 435, 439–442 (1998)(footnotes omitted). *See also In re Till*, 301 F.3d 583 (7th Cir.2002), *cert. granted, Till v. SCS Credit Corp.*, 539 U.S. 925, 123 S.Ct. 2572, 156 L.Ed.2d 601 (Mem.) (2003) (No. 02–1016) (Chapter 11, 12, and 13 cramdown provisions analogous; collecting cases on determination of cramdown rates).

Along with many others, the *Till* court renders the term "cramdown" in its noun form, as do we.

**B. *Confirmation*:**

██ Section 1225 governs the confirmation of a chapter 12 plan. If the holder of an allowed secured claim does not accept the proposed plan, the debtor must either surrender the collateral or satisfy the requirements of § 1225(a)(5)(B), which provides:

> (a) Except as provided in subsection (b), the court shall confirm a plan if—
>
> (5) with respect to each allowed secured claim provided for by the plan—

(B) (i) the plan provides that the holder of such claim retain the lien securing such claim; and

(ii) *the value, as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed amount of such claim[.]*

(emphasis added).

The issue here for determination is whether the plan's treatment of the bank's claim satisfies that requirement. Wells Fargo argues that the debtors must cure according to the original terms of the notes, because they had matured and were in default on the petition date. But the plan here does not propose to cure the default; rather, it calls for full payment of the bank's allowed secured claim, and leaves the bank with its collateral.

 Section 1222(b)(3) is permissive rather than mandatory: "Subject to subsections (b) and (c) of this section, the plan *may* ... (3) provide for the curing or waiving of any default[.]" (emphasis added). And Section 1222(d), added by the Bankruptcy Reform Act of 1994 (overturning *Rake v. Wade*, 508 U.S. 464, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993)), is contingent, and applies only in the event of cure:

> Notwithstanding subsection (b)(2) of this section and sections 506(b) and 1225(a)(5) of this title, *if it is proposed in a plan to cure a default,* the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law.

(emphasis added).

As another court has said:

> [C]ounsel for Union Planters has not directed the Court to any authority *requiring* that an oversecured creditor must be paid on its contractual terms, as Union Planters insists is the law. The Court is unaware of any such authority. This argument seems to be in direct conflict with the provisions of §§ 1222(b)(9) and 1225(a)(5)(B). . . .

*In re Elk Creek Salers, Ltd.,* 286 B.R. 387, 393 (Bankr.W.D.Mo.2002)(emphasis in original).

The bank does not cite authority to support its assertion that debtors must either cure by paying fully-matured secured debt in full on the plan's effective date or pay interest at the contractual default rate on any deferred payments. While the bank urges us to rely on *Seidel v. Larson (In re Seidel),* 752 F.2d 1382 (9th Cir.1985) (a chapter 13 case interpreting § 1322(b)(2), which precludes the modification of claims secured by debtor's primary residence), and *Great Western Bank & Trust v. Entz–White Lumber & Supply, Inc. (In re Entz–White Lumber & Supply, Inc.),* 850 F.2d 1338, 1340–42 (9th Cir.1988), neither helps the bank.

*Entz–White* is a chapter 11 case interpreting § 1123(a)(5)(G), holding that a debtor's payment in full of the secured claim on the effective date of a fully matured obligation did not require the payment of default interest, and says nothing respecting payment over time post confirmation. As noted by the bankruptcy court, the continued viability of *Seidel* following the 1994 Code amendments (which permitted some modification in chapter 13 of claims secured by a debtor's primary residence) is questionable. Memorandum of Decision, at 13 n. 9, *citing, inter alia, In re Jones,* 188 B.R. 281, 283–84 (Bankr. D.Or.1995). More importantly, there is no parallel limitation on modification in chapter 12.

No case authority or Code provision requires a reorganizing debtor to cure a prepetition default or to pay the secured

creditor according to pre-bankruptcy default provisions. The bank's objection to confirmation rests on the mistaken premise that an uncured default mandates the plan either cure defaults or provide the contractual default remedies. Not so: cramdown is available to debtors in chapters 11, 12, and 13.

## C. *Present Value of Claim*

■ The remaining question is whether the plan provides for interest at an appropriate rate: specifically whether the plan provides payments to the bank having a present value equal to the amount of its secured claim. As the Ninth Circuit has noted:

> A standard bankruptcy treatise explains the process used by the bankruptcy court in applying 11 U.S.C. § 1225(a)(5)(B), the Chapter 12 cramdown provision:
>
> > When the debtor's plan proposes to pay a secured claim in deferred cash installments, the court must find that the present value of the proposed payments is not less than the allowed amount of the secured claim. In order to make this finding, it will be necessary for the court to apply a discount factor to the proposed stream of payments to determine the present value of those payments. This is typically accomplished by ascribing an interest rate to the allowed amount of the claim and by requiring payment of the amount of the claim along with interest at the specified rate.

*Fowler*, 903 F.2d at 696–97 (citing 5 *Collier on Bankruptcy* ¶ 1225.03[4][c], at 1225–21 (15th ed.1989)).

When raised as an evidentiary issue, the approaches to determining present value vary: "[t]he ideal method for determining the market rate is for the court to take testimony on current market interest rates regarding loans for the length of time involved secured by the type of property involved." 8 *Collier on Bankruptcy,* ¶ 1225.03, at 1225–21–2 (15th ed. rev.2003) (citation omitted). *See also Fowler,* 903 F.2d at 697–99 (following "market" approach to determine the cramdown rate of interest). But the bank here introduced no evidence of market interest rates or terms of similar loans in this contested confirmation.

The Third Circuit has held that, absent contrary evidence, the contract rate is presumptively the appropriate rate:

> The contract rate of interest is, of course, the rate that the creditor voluntarily agreed to accept at an earlier date. While in some cases the passage of time will have seen a material increase or decrease in the lending rate of the creditor, the contract rate is a fair place to begin. In the absence of a stipulation regarding the creditor's current rate for a loan of similar character, amount and duration, we believe it would be appropriate for bankruptcy courts to accept a plan utilizing the contract rate if the creditor fails to come forward with persuasive evidence that its current rate is in excess of the contract rate. Conversely, utilizing the same rebuttable presumption approach, if a debtor proposes a plan with a rate less than the contract rate, it would be appropriate, in the absence of a stipulation, for a bankruptcy court to require the debtor to come forward with some evidence that the creditor's current rate is less than the contract rate.

*General Motors Acceptance Corp. v. Jones,* 999 F.2d 63, 70–71 (3rd Cir.1993) (footnotes omitted). The two circuits which have since considered the question agree, and have adopted the presumption: *Green Tree Fin. Servicing Corp. v. Smithwick*

*(In re Smithwick)*, 121 F.3d 211, 214 (5th Cir.1997) and *Till,* 301 F.3d at 592–93. The Supreme Court is presently considering the question in *Till.*

We need not go so far as the courts adopting a presumption. Regardless of how the Supreme Court may rule in *Till,* in which it granted certiorari presumably to consider whether the contract rate should be the presumptive cramdown rate, the question in this appeal will not be resolved. Here, we have *two* contract rates: the regular (non-default) rate and the default rate. If the contract rate is the presumptive cramdown rate, which contract rate is it? Nor would a reversal of *Till,* which held the contract rate was presumptively the minimum cramdown rate, 301 F.3d at 592–93, answer our question. If the Supreme Court approves the bankruptcy court's formula approach (prime plus 1.5%), neither party here presented any evidence to support any particular risk premium or formula.

Here the only interest rate evidence was that provided by the notes: the regular contract rate and the default rate. If, as *Fowler* notes, "evidence of market interest rates for similar loans is relevant in arriving at the appropriate risk factor," 903 F.2d at 698, which is then used to derive the cramdown rate, surely the regular interest rate debtor and the bank previously agreed upon is relevant evidence of the market rate. While the contract's default rate may also be probative of the market rate, as we have noted:

> Where a debtor does not cure defaults, a creditor is entitled to default interest upon demonstrating that the default interest meets certain requirements. Courts vary as to how they allocate the burden of proof regarding the right to default interest. In *Casa Blanca,* we imposed the evidentiary burden on a creditor to demonstrate the reasonableness and compensatory nature of the default rate. Other decisions, including circuit court decisions, allow default interest at the contract rate unless the debtor overcomes an initial presumption that the contractual default rate is reasonable.
>
> Regardless of how the burden of proof is allocated, [the lender] is not automatically entitled to default interest at the contract rate. Under *Casa Blanca,* "consideration of whether a given default rate is within the range of a generally acceptable level of interest is not determinative." *The creditor must demonstrate* that the default rate is equivalent to damage by "evidence or proof of a tangible nature." [The lender] produced no such proof in this case. It argued that the Default Rate is reasonable because it falls within a generally-accepted range, and because the same rate of default was approved for the new note. These arguments do not demonstrate, with the specificity required by *Casa Blanca,* that the Default Rate compensated [the lender] for actual losses.

*Hassen Imports P'ship v. KWP Fin. VI (In re Hassen Imports P'ship),* 256 B.R. 916, 924–25 (9th Cir. BAP 2000), *citing Casa Blanca Project Lenders, L.P. v. City Commerce Bank (In re Casa Blanca Project Lenders, L.P.),* 196 B.R. 140, 146–47 (9th Cir. BAP 1996) (other citations and footnotes omitted; emphasis added).

The bank cites no authority that a presumption in favor of the default rate has since arisen in this circuit. Although *Hassen Imports* was a chapter 11 case, the analysis is the same under chapter 12. *See Fowler,* 903 F.2d at 697 and Epstein, *supra.*

Alternatively, both the notes' regular rate and their default rate are probative of an appropriate market rate, which evidence a trier of fact may accept or reject.

In this instance, they were the only evidence before the court, because the bank took a heroic "default rate or bust" approach, even though *Fowler* suggested various other evidence logically relevant to the choice of a cramdown rate. The trier of fact elected to believe the regular rate, rather than the default rate, was the market rate which (in the same fashion as choosing among competing appraisals) was appropriate. *Casa Blanca*, 196 B.R. at 146–47. There plainly was some evidence, the regular contract rate, to support the bankruptcy court's conclusion.

Since the state of the evidence was, at worst, in equipoise, and since the bank chose to forego its opportunity to introduce other evidence blessed by *Fowler*, it has not carried its burden on appeal to demonstrate that the fact-specific choice of the regular contract rate as the cramdown interest rate was clearly erroneous. *See Household Automotive Fin. Corp. v. Burden (In re Kidd)*, 315 F.3d 671, at 677–78 (6th Cir.2003) (affirming the bankruptcy court's setting of rate after a contested evidentiary hearing).

The bankruptcy court correctly ruled that the plan need not provide for payment of interest at the notes' default rate, and its choice of the pre-bankruptcy contract rate was not clearly erroneous.

## VI. CONCLUSION

A chapter 12 plan may be confirmed over a secured creditor's objection although it neither cures an existing default nor provides for payment of the contractual default interest, even if the underlying obligation matured prepetition. Rather, the creditor is entitled to retain its lien and to receive the present value of its claim (and thus the market rate of interest on deferred payments).

Having chosen to emulate Horatio, but neglecting to bring its evidentiary sword to the bridge, the bank lost the battle. It has not shown the bankruptcy court's determination of the cramdown interest rate was clearly erroneous.

We AFFIRM.